645 So.2d 190 (1994)
STATE of Louisiana
v.
Leslie D. MARTIN.
No. 93-KA-0285.
Supreme Court of Louisiana.
October 17, 1994.
Concurring Opinion October 21, 1994.
Rehearing Denied December 8, 1994.[*]
*192 David J. Williams, Glen D. Vamvoras, and Perry R. Sanders, Jr., for applicant.
Richard P. Ieyoub, Atty. Gen., Robert Bryant, Dist. Atty., Patricia H. Minaldi, Paul P. Reggie, and Angie R. LaPlace, for respondent.
Concurring Opinion by Justice Calogero October 21, 1994.
LEMMON, Justice[*].
This is an automatic appeal from a conviction of first degree murder and a sentence of death. La. Const. art. V, § 5(D)(2). The principal issues are (1) the sufficiency of the evidence of an aggravated rape, which is an essential element of the crime of first degree murder in La.Rev.Stat. 14:30; (2) the trial judge's denial of a motion for continuance filed by the attorney who was appointed to replace defendant's original counsel six weeks before the trial; (3) the admissibility of evidence of other crimes; and (4) the admissibility of allegedly gruesome photographs.[1]
Facts
On June 20, 1991, defendant and Michael Roland went to the 12th Street Lounge in Lake Charles at about 11:00 p.m., after playing pool and drinking beer for about two hours. The victim, a college student and part-time employee at a pizza outlet, also went to the lounge between 11:00 p.m. and midnight with some of her friends. Defendant and the victim met through Roland, who had known the victim previously. During the evening, the victim danced with defendant, while each shared beverages and companionship with other friends in the lounge.
About 1:30 a.m. the next morning, after Roland and most of the victim's friends had left the lounge, the victim asked defendant for a ride home, and defendant agreed. No one ever saw the victim alive again.
About 7:30 a.m., defendant visited Leo Guimbellot, his carpentry supervisor on a recent job, and stated he had met a blonde college student the night before, left the lounge with *193 her and woke up on Galveston Beach not knowing where he was. Defendant's clothes were dirty, and he pointed to vomit in his ashtray, stating, "I guess the bitch threw up in my truck."
When defendant returned to his aunt's home, where he was residing at the time, he was wearing different pants than he wore at the time he left the previous evening, and he had no shirt or shoes. He washed his clothes and his truck seat cover, telling his aunt that they got muddy when he engaged in mud slinging with Roland. Defendant also had scratches on his chest and back, a bite mark on his shoulder, and a tear under his tongue. He told his cousin he had fought with a "country boy" in the lounge.
The same morning, defendant told Huey Rushing that he thought he may have killed someone the previous evening and asked Rushing to provide him with an alibi by saying he had spent the night at Rushing's home. Rushing refused, and defendant told him that on the way back to Lake Charles the woman threatened to report him for rape. Defendant talked about a shed in Iowa (a town in Calcasieu Parish) and related that he had put a rope around the girl's neck, choked her, cut her throat, dug her eyes out, and jumped up and down on a wooden board placed across her neck. In response to a question, defendant asserted that he did not want to be turned in for rape again.[2]
Rushing related defendant's story to his girlfriend, but they deemed it unreal until Rushing heard nine days later that a girl was missing after leaving the 12th Street Lounge. Rushing reported the story to the police, who found the victim's decomposing body in a search of sheds in the Iowa area. The police found a rope around her neck and a wooden board nearby which contained human blood. The police then obtained a warrant and arrested defendant.
At the trial, Rushing, Guimbellot and Roland testified to the facts stated above. Other testimony was provided by inmates with whom defendant was incarcerated after his arrest.
Robert Williamson testified that defendant stated he left the lounge with the victim, drove to a side road past Iowa and had sex with the highly-intoxicated victim. When the victim accused him of taking advantage of her, he feared a return to the penitentiary, and he pulled her from the truck and strangled her, but had difficulty killing her. Defendant disclosed that he had revealed the incident to a friend with whom he had "done time," and the friend had betrayed him to the authorities.
Michael Fontenot, who was also incarcerated with defendant, testified that defendant stated the victim asked for a ride home from the lounge, and he took her on a dirt road where he had sex with her after removing her tampon which she later reinserted. When she accused him of rape during the ride back, he pulled over near Iowa and strangled her until she passed out. When she resumed breathing, defendant strangled her with a rope and dragged her to a shed, where he left her. His friend told the police "where he put the body and everything."
Marlin Sweet was a cellmate that defendant had known some years earlier. Defendant related to Sweet the events of the evening of the murder, stating that he wanted to have sex with the victim, but that she refused because of her menstrual period. Defendant said he "had to have her" and "overpowered her," although she resisted and fought back. When the victim became hysterical after the sexual encounter and threatened to go to the police, he decided he was not going back to prison for "nobody." He choked her, first with his hands and then with a rope. She did not die, however, and he put a wooden board across her neck and jumped on it two or three times. Defendant then cut out her eyes with a knife so that she could not identify him.
There was little physical evidence because of the condition of the body. However, human blood was found on defendant's pants *194 and truck seat cover,[3] as well as on the wooden board recovered near the body.
After the completion of the evidence in the guilt phase of the bifurcated trial, the jury returned a unanimous verdict of guilty as charged.
In the penalty phase, the prosecution relied on the evidence presented in the guilt phase. The defense presented mitigating evidence by a psychiatrist and members of defendant's family.
The jury unanimously recommended the death penalty, finding as aggravating circumstances that (1) the offender was engaged in the perpetration of an aggravated rape, La. Code Crim.Proc. art. 905.4 A(1), and (2) the offense was committed in an especially heinous, atrocious or cruel manner, La.Code Crim.Proc. art. 905.4 A(7).
Sufficiency of the Evidence of Aggravated Rape
Defendant was charged with first degree murder, which is defined in La.Rev.Stat. 14:30 A(1) as follows:
A. First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... aggravated rape....[4]
An appellate court, in order to affirm a conviction, must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational finder of fact to conclude that every element of the crime was proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676 (La.1984).
Defendant contends that the state only proved second degree murder, failing to prove that the killing occurred when the offender was engaged in the perpetration of an aggravated rape. In arguing insufficiency of the evidence of aggravated rape,[5] defendant presents three arguments.
First, defendant contends that because of the lapse of time between the rape and the killing, the state's evidence failed to establish a specific intent killing "[w]hen the offender ... is engaged in the perpetration or attempted perpetration of ... aggravated rape." However, when the sexual crime and the homicide "formed one continuous transaction," this is sufficient to satisfy the requirements of La.Rev.Stat. 14:30 A(1), despite the lapse of time. State v. Copeland, 530 So.2d 526, 540 (La.1988).
Next, defendant contends that the state at most proved forcible rape,[6] but failed to prove the essential element of aggravated rape that the victim resisted the act to the utmost and her resistance was overcome by force. The distinction between aggravated rape and forcible rape is the degree of force by the perpetrator and the extent of resistance by the victim. State v. Parish, 405 So.2d 1080 (La.1981). The jury's function under the legislative scheme is to fix the range of punishment for guilty rapists by *195 returning a verdict that appropriately fits the crime and the degree of force employed.
The testimony of Marlin Sweet, relating defendant's statements, established that the victim refused defendant's advances, that he struggled with her and she fought back, and that he overpowered her. Moreover, the victim was much smaller than defendant. This evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to conclude, beyond a reasonable doubt, that the victim resisted the rape to the utmost and that her resistance was overcome by force of a degree sufficient to warrant the greater degree of punishment.
Finally, defendant contends that the only evidence of aggravated rape was defendant's statement and that an accused cannot be convicted in Louisiana on his own uncorroborated confession, citing State v. Willie, 410 So.2d 1019 (La.1982), and Summit v. Blackburn, 795 F.2d 1237 (5th Cir.1986).
The purpose of the corroboration rule is to test the reliability of a confession and thereby prevent an erroneous conviction based solely on an untrue confession. Warszower v. United States, 312 U.S. 342, 61 S.Ct. 603, 85 L.Ed. 876 (1941). The corroboration requirement has been traced to Perrys' Case, 14 How.St.Tr. 1312 (1660) in England, where the "victim" disappeared and his servant and two others were executed on the basis of the servant's confession before the "victim" reappeared. Corey J. Ayling, Corroborating Confessions: An Empirical Analysis of Legal Safeguards Against False Confessions, 1984 Wis.L.Rev. 1121.
Under the Louisiana corpus delicti rule, an accused cannot be convicted on his own uncorroborated confession without proof that a crime has been committed by someone. State v. Cruz, 455 So.2d 1351 (La.1984). The prosecution, in order to establish guilt, must show that the injury specified in the crime occurred and that the injury was caused by someone's criminal activity. 1 McCormick, Evidence § 145 (John W. Strong ed., 4th ed. 1992). The touchstone is trustworthinessan untrustworthy confession should not alone support a conviction, and corroboration is an effective test of the trustworthiness of a person's inculpatory statements.
In the present case, defendant concedes that independent evidence established the occurrence of a death caused by someone's criminal activity, thereby corroborating defendant's inculpatory statements admitting his commission of the murder of the victim. Defendant argues, however, that his statements admitting his commission of the aggravated rape were not corroborated by independent evidence.
Defendant's argument, and the decision in Summit v. Blackburn, 795 F.2d 1237 (5th Cir.1986), unjustifiably extend the Louisiana corpus delicti rule, which only requires corroboration of the reliability of an inculpatory statement. The rule should not be extended to add a requirement that independent evidence corroborate every element of the crime admitted in the accused's statement, the general reliability of which has been corroborated. Corroborating evidence need only show the essential injury involved in the charged crime (e.g., death caused by criminal activity in a murder charge) in order to establish the reliability of the inculpatory statements of the accused; the corroborating evidence need not show every element in the definition of the charged crime (e.g., the predicate felony in a felony murder).
This trustworthiness approach provides the necessary minimum assurance against convictions based on untrue confessions. We agree with the following statement in 1 McCormick, Evidence § 145 (John W. Strong ed., 4th ed. 1992).
The traditional approach has been to require that the elements of the offense be carefully distinguished and that the corroborating evidence tend to show each of these elements. A growing number of courts, however, are abandoning the strict requirement that the corroborating evidence tend to prove all elements of the corpus delicti. Thus the corroborating evidence need only tend to show the "major" or "essential" harm involved in the offense charged and not all of the elements technically distinguished. This tendency is most pronounced in homicide case, where *196 defendants are often tried for offenses that involve requirements beyond simply the causing of death in a criminal manner.
Felony murder cases have posed the problem with special difficulty. Under the traditional application of the corpus delicti formulation, the elements of felony murder include the predicate felony as well as the fact of death and the causing of it in a criminal way; the corroborating evidence would have to tend to prove that predicate felony. Most courts, however, have balked at this and have held that the corroborating evidence need not tend to prove the predicate felony. (emphasis added).
We therefore conclude in the present case that the evidence of death by strangulation and of a rope around the victim's neck constituted adequate independent corroborative evidence of the reliability of defendant's statements and thereby fulfilled Louisiana's requirement for testing the reliability of an accused's inculpatory statements. These statements, shown to be reliable by the corroborating evidence, established every essential element of the crime of first degree murder.

Denial of Continuance
Defendant argues that the trial court committed reversible error when it denied three motions for a continuance which were filed during the six-week period that lead counsel had to prepare for this case.
The public defender was initially appointed to represent defendant in this case nine months before the date of trial. The record establishes that the public defender filed and tried numerous pre-trial motions and conducted a pre-trial investigation. However, a conflict of interest became evident because many of the key witnesses were inmates who were represented by members of the public defender's staff, and the public defender was allowed to withdraw from the case. Six weeks before the scheduled trial date, the judge appointed two attorneys to replace the public defender as defense counsel.
Defendant argues that when lead counsel was appointed to handle this case scheduled for trial on May 11, he was handling six murder cases, including two death penalty cases, one of which was set for April 20 and the other on June 15. Defendant further argues that while the trial court granted his motion for a psychiatric examination six days before trial, the psychiatrist could not conduct the necessary examinations and prepare a report sufficiently in advance of trial for meaningful use at trial.
As to the psychiatric examination, the psychiatrist did testify during the penalty phase of the trial and opined that defendant's statements were unreliable. The doctor based his opinions on his examination of defendant and a review of the records of another psychiatrist, which were in defense counsel's possession well before trial. (Indeed, the defense had subpoenaed that psychiatrist.) While the psychiatrist concluded that defendant's inculpatory statements had been unreliable, many of the relevant aspects of the statements were independently corroborated by other evidence.[7] Moreover, while defendant argues that the psychiatric testimony would have been important during the guilt phase, the motion for a psychiatric examination sought the evidence for the penalty phase.[8] Nevertheless, the doctor found no evidence of a mental disorder which would in any way render defendant insane or incompetent to proceed. Therefore, this record does not indicate that defendant was substantially prejudiced by the absence of the psychiatric testimony from the guilt phase of the trial.
As to the lack of preparation time, lead counsel had another murder trial scheduled just three weeks before the trial of the case at bar. Although this other trial was ultimately continued, counsel nevertheless *197 had to make all of the necessary preparations. Hence, lead counsel in effect only had three weeks to prepare, personally, for trial of the present case.
The decision to grant or deny a continuance lies within the wide discretion of the trial court. See La.Code Crim.Proc. art. 712; State v. Knighten, 436 So.2d 1141 (La. 1983). While it certainly would have been prudent for the trial court under the circumstances to allow more preparation time for newly appointed counsel in order to assure a fair trial (and perhaps for the district attorney to join in the motion for continuance), we cannot say either (1) that the trial court abused its much discretion in denying the motions for continuance, or (2) that the denial of the motion deprived defendant of a fair trial or of effective assistance of counsel, especially in view of the preparation of the case for trial by prior counsel. At least on this record, the denial did not result in any specific material prejudice to defendant. This is not to say that the trial court's ruling did not have the effect of rendering the assistance of trial counsel ineffective, but that issue is not presently before us. On this record, we cannot say that the trial court committed reversible error.

Other Crimes Evidence
Prior to trial, the state filed notice of its intent to use evidence of defendant's prior conviction of sexual battery in order to prove motive, since defendant had stated to several witnesses that he killed the victim to prevent her from telling authorities about the rape and causing him to be sent back to prison. The trial court ruled admissible the witnesses' testimony to the extent that defendant had a prior conviction and imprisonment.
At trial, Rushing testified that "[h]e didn't want to be turned in for rape again;" Wilkinson testified that "he was scared of going back to the penitentiary;" Fontenot testified that "[h]e didn't want to go down for rape again;" and Sweet testified that "[h]e said he wasn't going back to prison for nobody." Defendant argues that this evidence was not necessary to prove a genuine issue in this case, but was offered primarily to show defendant's bad character and action in conformity therewith, in violation of La.Code Evid. art. 404 B(1).[9] Defendant further argues that any probative value of the evidence of motive was far outweighed by "the danger of unfair prejudice" and should have been excluded by La.Code Evid. art. 403.[10] Defendant especially complains that even if the witnesses were properly allowed to testify that defendant previously had been imprisoned for conviction of a crime, the specification of his prior crime as rape was unfairly prejudicial. On the other hand, the state argues that it offered the evidence to prove that defendant's motive for killing the victim was to avoid going back to jail, and did not intend for the witnesses to give any details of defendant's prior crime. In any event, according to the state, the probative value of the motive and intent evidence outweighed the prejudice of the two witnesses' inadvertent mention of the word "rape."
Evidence of other crimes may be admissible to prove the motive and intent of the accused. La.Code Evid. art. 404B (1). Nevertheless, the state must show that the evidence is necessary to prove a matter genuinely at issue, that there is clear and convincing proof the accused committed the other crime, and that the probative value of the evidence of the other crime outweighs the prejudicial effect. State v. Goza, 408 So.2d 1349 (La.1982).
*198 Here, the key inquiry involves weighing the probative value of the evidence against its prejudicial effect.[11] Motive truly provided an independent basis for relevancy of the other crimes evidence. The victim freely left the lounge with defendant after socializing and dancing with him, and the defense argued that their sex act was consensual. Under this argument, there was no reason for defendant to kill the victim. Evidence that the victim intended to report the rape to the authorities was extremely relevant to defendant's motive for killing her and his specific intent to do so, as was the fact that defendant had previously been in prison and declared he "wasn't going back to prison for nobody." While these facts are prejudicial to defendant, all relevant evidence providing proof of the charged crime is prejudicial, and often the degree of probative value increases the degree of prejudice. However, it is only the danger of "unfair prejudice" that La. Code Evid. art. 403 requires to be considered in relation to probative value.
Although the reference to a sex crime as the basis for defendant's prior imprisonment was unnecessary and added to the prejudicial effect of the evidence, the primary prejudicial effect of the overall evidence arose from the admissible fact that the defendant had been to the penitentiary before and intended to avoid a return at any cost. The incremental prejudice of the reference to rape did not outweigh the extremely high probative value of the overall evidence under the totality of the circumstances.[12]

Gruesome Photographs
Defendant contends that the trial court erred in allowing the state to show to the jury various slides that were made from photographs of the victim's body. The photographs generally depicted the pump shed in the isolated area where the body was found, clothing, a purse and its contents, a wooden board with blood stains, and the decomposed body of the victim on the floor of the shed with a rope around her neck and maggots covering her body.
Post-mortem photographs of the victim are generally admissible to prove corpus delicti, to establish the identity of the victim, the location, severity and number of wounds, and to corroborate other evidence of the manner in which death occurred. State v. Eaton, 524 So.2d 1194, 1201 (La.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989); State v. Watson, 449 So.2d 1321, 1326 (La.1984). Admission of such photographs may be reversible error, however, when the prejudicial effect clearly outweighs the probative value. State v. Morris, 245 La. 175, 157 So.2d 728 (1963).[13]
In this case, the body of the victim had been rotting in a pump shed for nearly two weeks in the summer heat. It had been attacked by insects and maggots, and had otherwise decomposed. Several of the photographs are therefore very gruesome.
Nevertheless, the mere fact that a photograph is gruesome does not in and of itself render a photograph inadmissible. State v. Eaton, supra, at 1201. The admission of gruesome photographs is not reversible error unless it is clear that their probative value is substantially outweighed by their prejudicial effect. See La.CodeEvid. art. 403. For reversible error to be found, the photographs must be so gruesome as to overwhelm the jurors' reason and lead them to convict without sufficient other evidence. State v. Eaton, supra, at 1201; State v. Watson, supra, at 1326; State v. Lindsey, 404 So.2d 466, 475 (La.1981).
*199 Defendant claims that the photographs at issue have little probative value, because the doctor who performed the autopsy and several deputies each testified about the condition of the body, and the decedent was identified by her dentist, based upon her dental records, and by other identification which was found on the body, including a driver's license, a key chain, and rings.
We conclude that the photographs in this case are probative, because they shed light on the condition of the body, the position of the body, the general location of the murder scene, and the location of other evidence found on the scene. Photographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place or thing depicted are generally admissible. State v. Lindsey, supra, at 475. In this case, the photographs make it clear to the jury that it was impossible for the coroner to perform a thorough and adequate autopsy because of the badly decomposed condition of the body. Further, the rope around the victim's neck and the wooden board with blood stains graphically corroborated the admissions by defendant to the inmates who testified. Therefore, we cannot say that the probative value of the photographs was substantially outweighed by their prejudicial effect.
While a few of the photographs in question may clearly be described as gruesome, it cannot be said that seeing them would have overwhelmed the reason of the jurors and led them to convict the defendant without sufficient other evidence.

Capital Sentence Review
This court is required to review every death sentence to determine whether the sentence is constitutionally excessive. La. Sup.Ct.R. XXVIII; La.Code Crim.Proc. art. 905.9. The court considers (1) whether the sentence was imposed under influence of passion, prejudice, or arbitrary factors; (2) whether the evidence supported a finding of a statutory aggravating circumstance; and (3) whether the sentence, in view of both the offense and the offender, is disproportionate to the penalty imposed in other cases.
According to the Uniform Capital Sentence Report prepared after the trial by the judge, and the Capital Sentence Investigation Report prepared by the Department of Corrections, defendant was twenty-four years old at the time the offense was committed. He has never been married and has no children. Defendant has a sister, as well as a half-brother whom he has never seen. Defendant completed high school, (apparently by earning a GED), and his intelligence level (IQ of over 100) is in the "high" range. While there is some evidence that defendant's capacity was somewhat diminished at the time of the offense due to intoxication, an independent psychiatric examination determined that defendant was able to distinguish right from wrong, adhere to the right, and cooperate intelligently in his own defense.
Defendant has a juvenile record dating back to 1981. Activities such as running away, damaging property, and simple assault are noted, and the record reflects numerous adjudications and commitments to the Department of Corrections.
In 1984, defendant drew a knife on his fourteen-year old sister and forced her to have sex with him.[14] He was accused of aggravated rape, convicted of sexual battery, and sentenced to ten years in jail.[15]
The victim in this case was a twenty-year old female college student. Prior to the time of the murder, defendant and the victim had not met. Defendant and the victim were both Caucasians.
Passion, Prejudice and Other Arbitrary Factors
Defendant complains that the prosecutor injected several appeals to passion, prejudice, and other arbitrary factors into the proceeding during his closing argument in the guilt phase. Defendant first alleges *200 that the prosecutor deliberately appealed to the passion of the jury by alluding to the suffering of the victim's family. At one point, the prosecutor was drawing the distinction between television and reality, emphasizing that "in this case we deal with real people who suffer and hurt and have pain, with families who suffer and hurt and sit silently helpless to do anything in this type of case and depend on the criminal justice system...."
The Eighth Amendment does not automatically bar the limited use of so-called victim impact evidence to impress upon the jurors the victim's individual identity and the existence of survivors reasonably expected to grieve. Payne v. Tennessee, 501 U.S. 808, 820-22, 111 S.Ct. 2597, 2606, 115 L.Ed.2d 720 (1991); State v. Bernard, 608 So.2d 966, 970 (La.1992). In this case, one cannot say that these statements interjected any passion, prejudice, and other arbitrary factor which led to excessive sentencing of the defendant.
At another point, the prosecution stated that while the victim's "night of horror had ended hours earlier ... but her family and friends' pain was only just beginning, and what would ultimately happen with them or what they would ultimately determine happened would only come out ten, eleven days later." Despite defendant's argument that this was an appeal to passion, prejudice, and other arbitrary factors, the ample evidence of the family's efforts to locate the victim, including reports to the police, inquiries to friends and at the Twelfth Street Lounge, the posting of handbills and the offering of a reward, indicates that this argument was based on evidence adduced at trial and did not exceed the scope of argument delineated by La.Code Crim.Proc. art. 774.
Defendant also complains of the prosecutor's statement that "if [the victim] is looking down on all of us from heaven at this time, the most horrible thing to her must be to be remembered as what we saw in that tool shed and what was left of her...." Defendant contends that the reference to the victim's looking down from heaven was improper and inflammatory. However, even assuming that such remarks were inappropriate, a conviction will not be reversed due to an improper remark during closing argument unless the court is thoroughly convinced that the remark influenced the jury and contributed to the verdict, as much credit should be accorded to the good sense and fairmindedness of jurors who have seen the evidence and heard the arguments, and have been instructed repeatedly by the trial judge that arguments of counsel are not evidence. State v. Kyles, 513 So.2d 265, 275-76 (La. 1987); State v. Jarman, 445 So.2d 1184, 1188 (La.1984). In this case, it cannot be said that the prosecutor's statements created a substantial risk that the death penalty would be imposed under the influence of passion, prejudice, or other arbitrary factors.
Finally, defense counsel points to the prosecutor's characterization of defendant as a beast.[16] During his closing argument, the prosecutor briefly discussed the movie, "Beauty and the Beast," noting that the movie's beast was ugly on the outside but gentle on the inside. The prosecutor then said, "The difference in this case is that the beast is ugly on the inside and he's real pretty on the outside but he's ugly on the inside, and that's what [the victim] couldn't see until it was too late."
In State v. Gray, 351 So.2d 448 (La.1977), this court reviewed the defendant's conviction and life sentence for aggravated rape. In closing argument, the prosecutor intimated that Gray was an animal. In rejecting the claim that the trial court erred in refusing to grant a new trial based on this reference, this court stated:
In State v. Vernon, 251 La. 1099, 208 So.2d 690 (1968) and State v. McGregor, 257 La. 956, 244 So.2d 846 (1971), we refused to reverse convictions when the district attorney referred to the defendant as an animal, in part because the evidence supported that characterization. Certain morally reprehensible conduct, such as that at issue in the present case, defies characterization as civilized behavior and *201 may more faithfully be described as that of an animal. While in some cases a similar statement by the State may require reversal, we cannot say that the remark was so unfairly prejudicial as to require such a drastic remedy. See State v. Williams, [346 So.2d 181 (La.1977)]; State v. Lee, 340 So.2d 180 (La.1976).
351 So.2d at 460. Although prosecutors ought to refrain from characterizations such as the one of which defendant complains, here, as in Gray, it cannot be said that the remarks of the prosecutor were so unfairly prejudicial as to warrant reversal.

Aggravating Circumstances
The jury found the existence of two aggravating circumstances in this case: the killing occurred during the commission of an aggravated rape, La.Code Crim.Proc. art. 905.4 A(1); and the offense was committed in an especially heinous, cruel and atrocious manner, La.Code Crim.Proc. art. 905.4 A(7).
Defendant argues that the offense was not committed in an especially heinous, cruel and atrocious manner, asserting that the state did not prove there was torture or pitiless infliction of unnecessary pain on the victim. State v. Busby, 464 So.2d 262, 267 (La.1985); State v. Sonnier, 402 So.2d 650, 658 (La. 1981). However, the record clearly established that there was sufficient evidence to support the jury's finding that the killing occurred during the commission of an aggravated rape. The state need only prove one aggravating circumstance in order for the death penalty to be imposed. La.Code Crim. Proc. art. 905.3. Even if the evidence did not establish a killing in an especially heinous, cruel or atrocious manner (an issue we do not address), the failure of one statutory aggravating circumstance does not invalidate a death penalty if another aggravating circumstance is supported by the record, so long as the evidence offered in support of the arguably unproved aggravating circumstance did not inject an arbitrary factor into the proceeding. Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); State v. Sawyer, 422 So.2d 95 (La.1982). The evidence of an especially cruel killing here clearly was properly admitted and did not inject an arbitrary factor in the proceeding.

Proportionality
A proportionality review is not required by federal constitutional law. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Nevertheless, comparative proportionality review remains a relevant consideration in determining the excessiveness of sentence in Louisiana. State v. Kyles, 513 So.2d 265, 276 (La.1987).
According to the sentence review memoranda filed by the state, there have been fifty cases, other than this case, in the Fourteenth Judicial District since January 1, 1976 in which first degree murder was charged. Of these, eleven defendants were ultimately indicted and tried for first degree murder and found guilty as charged. In one of these cases the state did not seek the death penalty; in four cases the jury recommended life; and in the remaining six cases the jury recommended death and death sentences were imposed.[17]
After reviewing the facts of all fifty Calcasieu Parish first degree murder charges as set forth by the state, we conclude there is nothing disproportionate about the recommendation of the death penalty by the jury in this case. In fact, it is difficult to say that any one (or more) of these cases matches the brutality of the offense committed by the defendant in the instant matter.
Defendant committed a brutal crime less than a year after his release from prison for a serious sexual offense, wherein his then fourteen-year old sister was the victim. He *202 had a lengthy, if not serious, juvenile record. And based on the clear indication that defendant committed a crime which ranks among the most horrible and brutal in Calcasieu Parish over the past eighteen years, the death penalty in this case is not disproportionate.

Decree
The conviction of first degree murder and sentence of death are affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution as provided by La.Rev.Stat. 15:567 until:
(a) defendant fails to petition the United States Supreme Court timely for certiorari;
(b) that court denies his petition for certiorari;
(c) having filed for and been denied certiorari, defendant fails to petition the United States Supreme Court timely under their prevailing Rules for rehearing of denial of certiorari; or
(d) that court denies his application for rehearing.
WATSON, J., not on panel. Rule IV, Part 2, Section 3.
CALOGERO, C.J., concurs and assigns reasons.
WILLIAMS, J., dissents and assigns reasons.
CALOGERO, Chief Justice, concurring.
I write separately to voice my disagreement with the majority's holding that the corpus delicti rule, i.e. the rule that an accused cannot be convicted on his own uncorroborated confession, is inapplicable to the underlying felony in a capital felony-murder prosecution. In my view, when proof of an underlying felony is at issue and the stakes are life and death, the applicable legal and moral principles mandate that the corpus delicti rule be applied. Nonetheless, I concur in the majority's decision because I believe that, as a matter of fact, the underlying felony in this case was sufficiently corroborated by evidence other than the defendant's confession so as to justify its admission into evidence.
The majority asserts that to require corroboration of an inculpatory statement would "unjustifiably extend the Louisiana corpus delicti rule," and that "[t]he rule should not be extended to add a requirement that independent evidence corroborate every element of the crime admitted in the accused's statement." I disagree with this reasoning insofar as the additional "element" of first degree murder, i.e. commission of aggravated rape, serves to make a defendant part of the death-eligible class and to legitimate his execution by the State.
It is a fundamental tenet of our law that the imposition of the death penalty is only permissible when there exist "carefully defined standards that must narrow a sentencer's discretion to impose the death sentence." McCleskey v. Kemp, 481 U.S. 279, 304, 107 S.Ct. 1756, 1773-74, 95 L.Ed.2d 262 (1987) (emphasis omitted). This is because the decision to impose the death penalty "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action" in order to ensure that the death penalty will not "be imposed on a capriciously selected group of offenders." Gregg v. Georgia, 428 U.S. 153, 189, 199, 96 S.Ct. 2909, 2932, 2937, 49 L.Ed.2d 859 (1976). Accord, Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).
The United States Supreme Court has consistently required that the determination of who will receive the death penalty be guided by "an objective legislative definition." Lowenfield v. Phelps, 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988); Caldwell v. Mississippi, 472 U.S. 320, 328-329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985); Zant v. Stephens, 462 U.S. 862, 876 n. 13, 103 S.Ct. 2733, 2742 n. 13, 77 L.Ed.2d 235 (1983). Part of the "legislative definition" prescribing the death-eligible class in Louisiana is the commission of murder while engaged in an enumerated felony. LSA-R.S. 14:30(A)(1). To pass constitutional muster, a capital sentencing scheme, like that in Louisiana, which imposes the death sentence for a superior degree of murder, must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant, supra, at 877, 103 S.Ct. at 2742.
In my opinion the majority's approach derogates from these well-settled principles in refusing to extend the corpus delicti rule to the underlying felony which, under Louisiana *203 law, transforms second degree (non-capital) murder into first degree (capital) murder. See LSA-R.S. 14:30(A)(1) (first degree murder defined as murder with specific intent to kill or inflict great bodily harm while engaged in one of enumerated felonies). The corpus delicti rule as it now stands in this state requires evidence of the crime which a jury might reasonably accept as establishing the fact of its commission beyond a reasonable doubt. State v. Willie, 410 So.2d 1019, 1029 (La.1982); State v. Carson, 336 So.2d 844 (La.1976). I believe that this rule should be applied to the underlying felony in capital felony murder because the constitutional standards recited herein demand it to legitimate the process of selecting a death-eligible class. In addition, the rule's application in this context accords with the Legislative directive that a penalty phase jury in a capital trial find beyond a reasonable doubt that the defendant was engaged in an underlying felony in order to justify the use of the underlying felony as an aggravating circumstance in making that defendant death-eligible. LSA-R.S. C.Cr.P. Art. 905.3, 905.4(A)(1).
The majority asserts that the touchstone of the corpus delicti rule is the trustworthiness of the extrajudicial confession, and that evidentiary corroboration of the defendant's murder confession renders inculpatory statements addressing the underlying felony admissible as well. I submit that a corroborated murder confession makes it likely the defendant will be convicted of murder, but not necessarily of capital murder as defined by the Legislature. This distinction, between murder and murder for which the death penalty may constitutionally be imposed, is a vital one, since "the circumstances of the particular offense (are) a constitutionally indispensable part of the process of inflicting the death penalty." McCleskey, supra, at 303, 107 S.Ct. at 1773, quoting Woodson v. North Carolina, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). The result of the majority's refusal to appreciate this distinction, in my opinion, is a derogation from the constitutional edict that "capital punishment be imposed fairly, and with reasonable consistency, or not at all." Eddings v. Oklahoma, 455 U.S. 104, 112, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982). Accord, State v. Brogdon, 457 So.2d 616, 625 (La.1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1984), re'hg denied, 473 U.S. 921, 105 S.Ct. 3547, 87 L.Ed.2d 670 (1985).
Of particular concern to me is the fact that the majority, in treating an issue which is res nova for this Court, reached its decision by relying upon treatise commentary which is, by its own admission, inconclusive. See 1 McCormick, Evidence, § 145 (4th ed. 1992). I admit, as one would expect, that various jurisdictions have divergent views of this matter, and it may even be, as McCormick states, that "[m]ost courts ... have held that the corroborating evidence need not tend to prove the predicate felony." Id. See also Ballard v. Maryland, 333 Md. 567, 636 A.2d 474 (Ct.App.1994) (corpus delicti rule does not apply to underlying felony of capital murder); State v. Bradford, 254 Kan. 133, 864 P.2d 680 (1993) (corpus delicti rule applies to underlying felony of capital murder); Gribble v. State, 808 S.W.2d 65 (Tex.Crim.1990), cert. denied, 501 U.S. 1232, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (corpus delicti rule applies to underlying felony of capital murder); Hart v. State, 301 Ark. 200, 783 S.W.2d 40 (1990) (corpus delicti rule does not apply to underlying felony of capital murder); People v. Mattson, 37 Cal.3d 85, 207 Cal.Rptr. 278, 688 P.2d 887 (1984) (statute applying corpus delicti rule to underlying felony of capital murder); Gentry v. State, 416 So.2d 650 (Miss. 1982) (corpus delicti rule does not apply to underlying felony of capital murder). The cited national jurisprudence on this issue does not, however, justify the majority's cursory dismissal of defendant's argument, especially when there is jurisprudence to the contrary, passing upon Louisiana law, in the United States Court of Appeals for the Fifth Circuit. See Summit v. Blackburn, 795 F.2d 1237 (5th Cir.1986).
As the majority notes, the corpus delicti rule is a peculiar creature of state law derived from practices of the Common Law courts of England. I submit that it is proper for this Court on policy grounds alone, policy grounds animated by the constitutional concerns broached herein, to apply the corpus delicti rule to the underlying felony in capital felony murder prosecutions. Furthermore, I *204 observe that all such state practices are subject to the prohibitions of the Eighth and Fourteenth Amendments to the federal Constitution, and I note without discussing further that the corpus delicti rule is recognized and enforced in federal criminal prosecutions. See Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954); Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954). Finally, Article I, § 20 of the Louisiana Constitution of 1974 "provides an additional and, where appropriate, more expansive source of protection against the arbitrary and non-individualized 5 imposition of the death penalty." State v. Ramseur, 106 N.J. 123, 524 A.2d 188 (1987). See State v. Perry, 610 So.2d 746, 762 (La.1992) ("Article I, § 20 affords no less, and in some respects more, protection than that available to individuals under the Cruel and Unusual Punishments Clause of the Eighth Amendment").
Despite my objection to the legal conclusion of the majority in this respect, however, I concur in the Court's opinion and judgement because the facts in the record indicate that there exist sufficient evidence corroborating the defendant's inculpatory statements regarding the aggravated rape to warrant admission of these statements.
The trial testimony of Guimbellot established that the defendant had scratches on his forehead, neck, and shoulders that Guimbellot had not observed the previous day. The trial testimony of the defendant's cousin, David Hyatt, established that the defendant had a bite mark on his shoulder, scratches on his back, and a tongue tear. In toto, the testimony of these witnesses, along with other evidence adduced at trial, could reasonably warrant a jury's conclusion of non-consensual intercourse and the victim's resistance to the utmost, i.e. aggravated rape. Accordingly, there is little risk that the defendant's confession to aggravated rape (along with the murder) was a confession to a crime that did not take place.
This conclusion is supported when the evidence is measured against the standards revealed in the jurisprudence. In State v. Morgan, 103 So. 278 (La.1925), this Court found that the corpus delicti of the crime of unlawful carnal knowledge was found not to be proven where no evidence of the crime existed other than the defendant's confession.[1] In State v. Sellers, 292 So.2d 222, 223 (La.1974), however, this Court found that the testimony of a deputy coroner who examined the alleged victim and the victim's landlady who heard the victim cry for help was sufficient to establish the corpus delicti of aggravated rape. Furthermore, the testimony of a rape victim is sufficient to establish the corpus delicti of rape. See State v. Worthy, 532 So.2d 541, 553 (La.App. 1 Cir.1988).
When measured by these standards, particularly those accepted in Sellers, supra, the evidence adduced at trial by the State is sufficient to establish the corpus delicti of aggravated rape in this case, and the defendant is therefore properly within the death-eligible classification. Thus, although I disagree with the majority as to the applicable law, I concur insofar as the facts of this case show their result to be the correct one.
For this reason, I respectfully concur.
WILLIAMS, Justice (dissenting).
There was insufficient evidence presented at trial to support the jury's finding that an aggravated rape occurred prior to this homicide. At most, the majority's detailed recapitulation of the extrinsic evidence presented and of the defendant's inculpatory statements establish that sexual intercourse occurred and the victim was forced, thus forcible rape may have occurred.[1] Citing State v. Parish, 405 So.2d 1080 (La.1981), the majority correctly notes that the only distinction *205 between aggravated and forcible rape is the degree of force employed and the extent to which the victim resists. In Parish, the victim testified that Parish obtained entry to her apartment under false pretenses, seized her by the throat, clasped her mouth, said he wanted to make love, warned that he would kill her if she screamed, and dragged her toward a bedroom. She stated that he outweighed her about 130 pounds and was almost a foot taller. Parish was convicted by a twelve person jury of attempted aggravated rape. This court reversed and set aside that conviction, finding Parish was guilty only of the lesser included offense of attempted forcible rape. The reversal was based on the finding that the degree of force exerted by the defendant was minimal.
In the instant case, there was insufficient proof of the degree of the victim's resistance, "utmost" resistance being an element of aggravated rape. LSA-R.S. 14:42(A)(1). The majority relies on the testimony of an inmate, Marlin Sweet, the only one of several witnesses to state that Martin told him the victim resisted Martin's advances. The degree of the victim's resistance before and/or during intercourse was never established at trial. There was no evidence linking the scratches on Martin's chest and back, the bite mark on his shoulder, and the tear under his tongue to the victim or to a rape. Martin stated he received those injuries in a fight at a bar. At most, the jury could have reasonably inferred that an initially consensual act "turned sour" and the victim subsequently informed the defendant that she was going to "turn him in" for rape. It is very possible that after the victim's threat, a fight occurred between the victim and the defendant that ultimately lead to the victim's death.
The majority also relies on the small size of the victim in relation to Martin to corroborate aggravated rape. In State v. Papillion, 467 So.2d 136 (La.App. 3 Cir.1985), the court found that the size and age of a thirteen year old boy, and the nature of the act of rape, were insufficient to meet the element of force required in the act of forcible rape. Thus, the majority's reliance on the size of the victim to corroborate aggravated rape is an impermissible inference.
In sum, there was insufficient evidence to support the majority's conclusion that the state carried its burden of proving beyond a reasonable doubt that the victim resisted the act of sexual intercourse to the utmost and that her resistance was overcome by force. Since our law mandates that each element of the offense be proved beyond a reasonable doubt, the defendant's assignment of error number one, regarding the sufficiency of the evidence, has merit. The jury's verdict should be reduced to the lesser and included offense of second degree murder.
I respectfully dissent.
NOTES
[*] Johnson, J., replacing Judge Williams, participated in rehearing application.
[*] Judge William Norris, III, Court of Appeal, Second Circuit, sitting by assignment in place of Justice James L. Dennis; Judge Felicia Toney Williams, Court of Appeal, Second Circuit, participating as Associate Justice Pro Tempore, effective September 1, 1994.
[1] Defendant's other assignments of error involve only settled principles of law and are treated in an unpublished appendix, which is attached to this opinion and is part of the official record.
[2] Defendant had a previous conviction for sexual battery and had served several years of a ten-year sentence.
[3] There was evidence that bloodstains are not easily removed by washing.
[4] Under the present law, as amended in 1987, the definition of first degree murder also includes a killing when the offender is engaged in the perpetration of a forcible rape. However, the state charged in the bill of indictment that defendant did "kill [the victim] while engaged in the perpetration of aggravated rape."
[5] Aggravated rape is defined in La.Rev.Stat. 14:42 in pertinent part as follows:

A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
[6] La.Rev.Stat. 14:42.1 defines forcible rape as follows:

Forcible rape is a rape committed where the anal or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
[7] The body was found, for example, in a pump shed near Iowa, with a rope tied around the victim's neck; a piece of wood with human blood was found near the body; the victim was wearing different clothes, including shorts that appeared to be "swim trunks;" and the coroner found what appeared to be lacerations on the victim's eyelids.
[8] Defendant's third motion for a continuance, filed on the day of trial, asserted that the psychiatric evidence would be needed in the penalty phase.
[9] La.Code Evid. art. 404 B(1) provides:

Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. (emphasis added).
[10] La.Code Evid. art. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
[11] Motive was a matter genuinely at issue, since the defense contended the sex act was consensual. Moreover, the fact that defendant was convicted of the prior crime was clear and convincing proof of his commission.
[12] This is a close issue. Prosecutors who fail to carefully instruct witnesses against going beyond the limits of admissibility set by the trial judge after "Prieur hearings" tread dangerously on the grounds of reversible error.
[13] In Morris, the Court held that admission of gruesome photographs taken during the autopsy was prejudicial error where the photographs were emotionally disturbing, the cause of death had been established as gunshot wounds to the abdomen, and the sole issue in the case was whether the killing was intentional or committed in a heat of passion.
[14] Apparently defendant pulled a knife on her while she was in the bathroom and fondled her breasts. She ran into his mother's bedroom and locked the door behind her. Martin knocked down the door and told his sister that he had paid someone $25 to kill her if she did not do what he said. Then he forced her to have sex with him on the bed.
[15] The sentence was partially served when defendant was released on parole in April of 1990.
[16] The defendant makes five additional claims of inappropriate conduct on the part of the district attorney. These claims are repetitive and without merit.
[17] The conviction of George English was affirmed on appeal, but the sentence was set aside. State v. English, 367 So.2d 815 (La.1979). Alvin Sylvester's conviction and sentence were reversed. (On remand he entered a manslaughter plea.) State v. Sylvester, 400 So.2d 640 (La. 1981). Joe Perry's conviction and death sentence were affirmed, (but he obtained post-conviction relief in federal court, and ultimately pleaded guilty to two counts of second degree murder). State v. Perry, 420 So.2d 139 (La. 1982). Troy Dugar's sentence was reduced to life, because of his tender age at the time of the commission of the offense. Dugar v. State, 615 So.2d 1333 (La.1993). Bartholomew Cross's appeal is pending in this court. (No. 93-KA-1189). Eddie Mitchell's appeal has recently been lodged. (No. 94-KA-2078).
[1] In Morgan, the alleged victim was not called by the State but by the defense, and testified that "the defendant did not have sexual intercourse with her and at no time offered any insult to her, nor injury to her person." Morgan, supra, at 278.
[1] I agree with the majority that at the time of this offense, forcible rape was not an aggravating circumstance under LSA-R.S. 14:30(A)(1).