| JETERS, Judge.
A jury convicted the defendant, Jason Keith Lormand, of two counts of first degree murder, violations of La.R.S. 14:30. However, the jury could not reach a unanimous decision during the sentencing phase of the trial, and the trial court then sentenced him on each count to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. The defendant has appealed, asserting three assignments of error. For the following reasons, we affirm the convictions and sentences in all respects.
DISCUSSION OF THE RECORD
The victims of the double homicide were Justin Price Fitzgerald and Heidi Studler, a young couple in their early twenties. They were killed during the early morning hours of August 21,1997, in a rural area of Lafayette Parish, and their bodies were dumped at another location in the same general area. Fitzgerald and Ms. Studler had spent their last hours in a number of nightclubs in the city of Lafayette, Louisiana, celebrating with friends the recent reconciliation of their personal relationship after a brief separation. The friends with whom they were celebrating left them sometime around midnight and never saw them alive again. A few hours later, Fitzgerald and Ms. Studler were each shot in the back of the head with a .22 caliber pistol. Officers of the Lafayette Parish Sheriffs Office discovered their badly decomposed bodies covered with plywood in a dumpsite in rural Lafayette Parish at approximately 3:00 a.m. on August 29, 1997. The investigation into their deaths resulted in the defendant’s arrest, indictment, and ultimate conviction. The defendant admits being present when the two were shot but claims that Jason Vidrine, an acquaintance of a few weeks, killed the couple.
The evidence is overwhelming that the killings were drug related and involved | ¡.a concern by the defendant and Vidrine, both drug dealers, that the victims were supplying law enforcement personnel with information concerning their illegal activities. In fact, an ongoing investigation into the defendant’s involvement in the trafficking of illegal drugs played a critical part in the evidence-gathering process of the double homicide.
The defendant’s involvement in trafficking illegal drugs had come to the attention of local law enforcement personnel about a month before the killings, and the evidence gathered in that encounter along with the defendant’s awareness of the potential criminal liability associated with the evidence against him caused him to agree to be a confidential informant for the Lafayette City Police. On July 29, 1997, he met with Officer Thomas Parker of the Lafayette Narcotics Unit and signed a confidential informant agreement wherein he *736 agreed to assist in combating the illegal drug activity in the Lafayette area. However, the defendant failed to provide any usable information. At trial, the defendant admitted that he never intended to comply with the confidential informant agreement and that he signed it for the sole purpose of avoiding prosecution for his activity.
What the defendant did not know was that his longtime friend, Todd James Gir-ouard, had also signed a confidential informant agreement with the Lafayette Narcotics Unit and was cooperating with law enforcement personnel. Girouard arranged an August 6, 1997 purchase of cocaine from the defendant by an undercover police officer. However, the police made no arrest at the time because they intended to attempt to arrange more purchases from the defendant.
It took little time for Girouard to obtain an agreement from the defendant to supply additional cocaine. On August 19, 1997, he met with the defendant and | aVidrine at a Lafayette residence and negotiated the purchase of a large quantity of cocaine (one-half kilo) for $10,000.00. Girouard testified that, during the discussion of how the cocaine transaction would take place, the defendant and Vidrine informed him that two. people had “ratted” on them and that they were going to “take care of them.” Initially, Girouard did not relate this part of the conversation to the officers with whom he was working because he did not really think the two men were serious.
The negotiation at the Lafayette residence resulted in an agreement to meet at a Lafayette hotel on August 21, 1997, to complete the transaction. On that evening, police officers wired the hotel room with audio and video monitoring devices and stationed themselves in the adjacent room in anticipation of arresting the defendant and Vidrine upon the completion of the transaction. However, although the narcotics transaction did not take place as planned, the event resulted in the acquisition of the most damaging evidence against the defendant concerning his involvement in the double homicide-a description of the murders from his own mouth captured on video.
The defendant appeared at the hotel room at approximately 10:30 p.m. but without the cocaine. In the video tape of the transaction, the defendant was shown making a number of telephone calls on a cellular telephone in an attempt to have the cocaine delivered. More important to the matter before us, the video tape also clearly revealed the defendant telling Girouard that he had taken care of “a couple of rats” the night before. He described in detail how he had held the male victim’s girlfriend as he shot him behind the left ear. The defendant then stated that the female victim was not even aware of what was happening until the male victim fell. She then screamed, “[0]h, my God,” and he shot her in a similar fashion. At one point during the exchange between the defendant and Girouard, the defendant placed his finger at 14the back of Girouard’s neck immediately behind Girouard’s left ear and told Girouard how he had shot the male victim at that point.
Despite the defendant’s telephone request, the cocaine he proposed to sell to Girouard never materialized. Ultimately, he left the hotel room without being apprehended. Despite the chilling nature of the defendant’s statements concerning the homicide, the police officers working the narcotics portion of the investigation had no information that anyone was missing, much less murdered. However, the information gained in this encounter was soon shared with other law enforcement officers investigating missing persons reports filed in relation to the disappearance of Fitzgerald and Ms. Studler. The information gathered in this continuing investigation ultimately led law enforcement personnel to discover the victims’ bodies in the early morning hours of August 29.
*737 A subsequent search of the defendant’s truck seized pursuant to a search warrant resulted in the discovery of blood and human hair in the bed of the truck. Christopher Harold Henderson, an expert forensic chemist, testified that the recovered hair was “microscopically indistinguishable” from the hair samples taken from Ms. Studler’s remains. Julie Golden, an expert forensic scientist at ReliaGena Technologies, a private DNA analysis firm in New Orleans, Louisiana, testified that there was only a 1 in 82,000,000 chance that the blood recovered from the truck was not Ms. Studler’s blood. Finally, Mary H. Manag-in, an expert in the field of forensic anthropology, testified that she examined the victim’s remains and determined that Ms. Studler was shot in the back of the head and that Fitzgerald was shot behind the left ear-both entrance wounds being the same as described by the defendant in the August 21 video.
1 ..¿Despite his damaging statements concerning his direct involvement in the murders, the defendant testified that he and Vidrine had picked up the victims on the early morning hours of August 21, not to kill them, but to acquire and consume illegal drugs. According to the defendant, it was Vidrine, and not he, who killed both victims. Out of fear for his own life, he assisted Vidrine in disposing of the bodies. The jury obviously rejected the defendant’s version of the events and returned its verdict of guilty on both counts. The defendant raises three assignments of error in his appeal.

Assignment of Error No. 1

In the first assignment of error, the defendant asserts that the trial court erred in refusing to allow him to impeach Girouard’s testimony by questioning him concerning his prior arrest. The defendant argues that he was entitled to question Girouard concerning his arrest to explain to the jury why Girouard might have incentive to “get” him.
Girouard began working as a confidential informant for the same reason the defendant signed the confidential informant agreement. He too had recently been apprehended with illegal drugs in his possession and was attempting to garner favor with law enforcement personnel. When Girouard was asked on cross-examination when he was last arrested for drugs, the state objected, arguing that the witness’s credibility could be attacked only by convictions. The trial court sustained the objection, relying on La. Code Evid. art. 609.1(B), which provides that “only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.” | fiWhile we agree that the trial court erred in sustaining the objection, we find that error to be harmless.
The supreme court addressed this very issue in State v. Brady, 381 So.2d 819 (La.1980), a case decided before the adoption of the Louisiana Code of Evidence.[1] In Brady, as in the case before us, the trial court prohibited the defendant from questioning a state witness concerning a pending charge. The trial court prohibited the questioning based on former La.R.S. 15:495 (which was repealed by Acts 1988, No. 515, § 8, effective January 1, 1989, and replaced by La. Code Evid. art. 609.1).[2] The supreme court reversed the trial court, concluding that the defendant’s questioning was not to impeach general credibility but to show the degree of leverage the state might have over the witness, which questioning was allowed under former La.R.S. 15:492 (which was also repealed by Acts 1988, No. 515, § 8, effective *738 January 1, 1989, and replaced by La. Code Evid. art. 613). That statute allowed a witness to be questioned as to “any particular fact showing or tending to show” bias or interest. Without mentioning the Louisiana Code of Evidence, the supreme court recently reached the same conclusion concerning the right of a defendant to question a witness’s motivation for testifying and stated that “[a] witness’s bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the state regarding his conduct.” State v. Vale, 95-577, 95-1230, p. 4 (La.1/26/96); 666 So.2d 1070, 1072.
In the matter before us, the trial court’s error is harmless because, although the |7defendant was not allowed to question Girouard concerning his arrest, the defendant did question him without objection from the state about the particulars of the arrest. Girouard acknowledged, upon further cross-examination, that he had been working for law enforcement because he had been stopped with “drugs in [his] truck” and hoped “to get some kind of deal” for himself. Thus, the defendant was effectively allowed to question Gir-ouard concerning his pending charge as motivation to “get” the defendant. This assignment of error lacks merit.

Assignment of Error No. 2

In this assignment of error, the defendant complains of certain rulings by the trial court during the jury selection process. He asserts that the trial court erred in granting the state’s challenges for cause as to four prospective jurors and in denying his challenges for cause as to four others. We need not consider the particulars of the challenges because we find that the defendant was not prejudiced by any of the rulings.
The trial court granted the state’s challenges for cause and dismissed four prospective jurors, Valerie Ellerbe, Darrell Meche, Billy Gerard, and Tammie Willis. The first two were challenged during the selection process for the regular panel and released based on La. Code Crim.P. art. 798(2), which sets forth the grounds upon which a prospective juror may be challenged by the state for his or her scruples against, or attitude toward, imposition of the death penalty.
La. Code Crim.P. art. 800 provides:
A. A defendant may not assign as error a ruling refusing to sustain a challenge for cause made by him, unless an objection thereto is made at the time of the ruling. The nature of the objection and grounds therefor shall be stated at the time of objection.
B. The erroneous allowance to the state of a challenge for cause does not afford the defendant a ground for complaint, unless the effect |sof such ruling is the exercise by the state of more peremptory challenges than it is entitled to by law.
Additionally, it is not necessary for a defendant to exhaust all of his peremptory challenges before he can complain on appeal of the trial court’s refusal to sustain a challenge for cause. State v. Guillory, 97-179 (La.App. 3 Cir. 3/11/98); 715 So.2d 400, writ denied, 98-955 (La.10/9/98); 726 So.2d 17. However, the erroneous denial of a challenge for cause is not automatically reversible error, and the “defendant must still demonstrate prejudice arising from the ruling.” Id. at 420.
As to the jurors challenged by the state, only Valerie Ellerbe and Darrell Meche were challenged during the regular empaneling process. The other two, Billy Gerard and Tammie Willis, were challenged by the state and excused during the selection of alternate jurors. When the twelve jurors were ultimately selected, the state had used only ten of its twelve peremptory challenges. See La. Code Crim.P. art. 799. Thus, the granting of the peremptory challenges did not have the effect of granting the state additional peremptory challenges. Based on La. Code Crim.P. art. 800(B), we find that this *739 part of the assignment of error has no merit. Furthermore, the jury did not recommend the death penalty, and the defendant can show no prejudice from the rejection of these two prospective jurors. See State v. Williams, 615 So.2d 1009 (La.App. 1 Cir.), writ denied, 619 So.2d 543 (La. 1993). Additionally, the defendant can show no prejudice in the exclusion of Billy Gerard and Tammie Willis because neither of the two alternate jurors ultimately selected participated as active members of the jury panel in the deliberation phase of the trial.
The defendant exercised challenges for cause against Rita Mouton, Darrall Tauzin, Sam Taulli, and Paul Stefan, and the trial court rejected them all. Of the four, only Rita Mouton ultimately served on the jury. Not only did the defendant exercise | speremptory challenges as to the other three, but when the jury was ultimately empaneled, he had three unused peremptory challenges. Thus, we find that the defendant has demonstrated no prejudice, and we reject this assignment of error.

Assignment of Error No. 3

In this final assignment of error, the defendant asserts that the trial court erred in admitting photographs of the area where the bodies were discovered as well as the video tape of the same area. The defendant asserts that these photographs were gruesome in nature and that their prejudicial effect outweighed their probative value because they did not depict the crime scene but merely the area where the bodies were discovered.
Prior to trial, the defendant filed a motion to exclude or limit the potentially gruesome and prejudicial photographs and requested that the court exclude the closeup photographs of the corpses, photographs taken during the autopsy, and other photographs which, in the words of the motion, were “inflammatory, prejudicial, gruesome, shameful and irrelevant.” At the hearing on the motion, which was taken up during the trial, the trial court issued the following ruling:
Okay. I’ve reviewed the two photographs that are objected to. The photograph of the victims’ bodies that has been objected to does have probative value. It establishes the location where the bodies were found. It would tend to show that the two victims were killed in a single event or at a minimum, their bodies were disposed of in a single event, and the decomposition of the bodies does tend to prove or at least provide some evidence that the murder — the murders occurred at some time in the past. It was not a very, very recent event. So it’s got probative weight and will be admitted, and the crime scene video, for the same reason except that the crimes — and I think we discussed this with all counsel in chambers — the crime scene video will be stopped at the point where the scene of the two bodies is shown, in other words, at the same point where the video depicts the same scene as in the still photograph.
The trial court’s ruling limited the state to the use of only one photograph of |inthe decomposing bodies and prohibited the state from showing the video portion of that specific part of the investigation. Thus, there is only one potentially “inflammatory, prejudicial, gruesome, shameful and irrelevant” photograph at issue. The photograph does show the decomposed bodies in the position and condition in which they were discovered approximately eight days after their disappearance and is rather graphic.
The supreme court in State v. Martin, 93-0285, p. 14 (La.10/17/94); 645 So.2d 190, 198, cert. denied, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995), stated the following concerning the admissibility of certain evidence:
Post-mortem photographs of the victim are generally admissible to prove corpus delicti, to establish the identity of the victim, the location, severity and *740 number of wounds, and to corroborate other evidence of the manner in which death occurred. Admission of such photographs may be reversible error, however, when the prejudicial effect clearly outweighs the probative value.
(Citations omitted).
In Martin, the body of the victim had been deteriorating for nearly two weeks in the summer heat and had been attacked by insects and maggots. In other words, the photographs were very gruesome. The supreme court stated:
Nevertheless, the mere fact that a photograph is gruesome does not in and of itself render a photograph inadmissible. The admission of gruesome photographs is not reversible error unless it is clear that their probative value is substantially outweighed by their prejudicial effect. For reversible error to be found, the photographs must be so gruesome as to overwhelm the jurors’ reason and lead them to convict without sufficient other evidence.
Id. (citations omitted).
In this particular case, testimony was presented concerning the ultimate location of the bodies as well as the fact that the individuals were killed in one place and their bodies dumped in another. The video and the other photographs were used |nto illustrate the surrounding area of the scene where the bodies were recovered. We find, as did the trial court, that the one photograph of the bodies as well as the video footage and other photographs of the surrounding area do have probative value because they corroborate the testimony of the law enforcement officers concerning their search. We do not find that the prejudicial effect outweighs the probative value of the photographs and video footage nor do we find that they are so gruesome as to have overwhelmed the jurors’ reason and led them to convict the defendant without sufficient other evidence. Thus, we find this assignment to be without merit.
Errors Patent
Pursuant to the mandate of La. Code Crim.P. art. 920, we reviewed the record for errors patent on the face of the record. In doing so, we discovered one such error.
The defendant was not informed by the trial court of the prescriptive period for filing post-conviction relief as required by La. Code Crim.P. art. 930.8. We, therefore, find it necessary to direct the trial court to inform the defendant of the provisions of Article 930.8 by sending the appropriate written notice to the defendant within ten days of the rendition of this opinion and to file proof that the defendant received such notice in the record of these proceedings. See State v. Fontenot, 616 So.2d 1353 (La.App. 3 Cir.), writ denied, 623 So.2d 1334 (La.1993). We further note that the time period for filing post-conviction relief was amended by Acts 1999, No. 1262, § 1, and changed the prescriptive period from three years to two years. Accordingly, the trial court is instructed to inform the defendant of the appropriate two-year rather than three-year prescriptive period.
DISPOSITION
For the foregoing reasons, we affirm the defendant’s convictions and sentences Lain all respects. We direct the trial court to inform the defendant that, pursuant to La. Code Crim.P. art. 930.8, he has two years from the date his judgments of conviction and sentences become final to apply for post-conviction relief. We instruct the trial court to give that notice to the defendant in writing within ten days of the rendition of this opinion and to file proof that the defendant received the notice in the record of these proceedings.
AFFIRMED AND REMANDED WITH INSTRUCTIONS.

. Acts 1988, No. 515, § 1, enacted the Louisiana Code of Evidence into law, and it became effective January 1, 1989.

. While there exists some language difference between former La.R.S. 15:495 and La. Code Evid. art. 609.1, the prohibition against questioning a witness concerning arrests is the same in both provisions.