| iMARVIN, Chief Judge.
After a jury found him guilty of the first degree murder of Pang Yang at the LSU Medical Center in late 1993 but could not agree on a capital verdict, Brandon Haynes, having been sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence, appeals his conviction. With one error questioning the sufficiency of the evidence to convict that was assigned through appointed counsel, Haynes assigns another in a pro se filing that asserts his trial counsel’s strategy rendered his counsel constitutionally ineffective. The pro se assignment is permitted by State v. Melon, 95-2209 (La. 9/22/95), 660 So.2d 466.
We affirm.
FACTS
Employed by a subcontractor, Brandon Haynes helped construct the Biomedical Research Institute (BRI) building on the Shreveport campus of the LSU Medical Center in 1993.
Early on the morning of October 26, 1993, the body of Pang Yang, a 26-year-old graduate student at LSU Medical School in Shreveport, was found in an alleyway adjacent to the BRI building which was in the last stages of construction. She had been raped both vaginally and anally, and had been cut and stabbed superficially before falling to her death from the roof of the ten-story BRI building.
Haynes’s counsel argues here, as he did below, that while the evidence may show that Haynes kidnapped, raped, robbed and cut and stabbed Fang Yang with a knife, the evidence does not negate the reasonable inference ofjjfour arguable ways that Fang Yang could have fallen to her death after the other felonies were committed.
As he did in the trial court, Haynes complains of his counsel’s above argument, which was effectively stated in his counsel’s opening remarks to the jury, conceding Haynes’s guilt of the underlying felonies relied on by the State for a conviction of first degree felony murder. The State contended below and here that after kidnapping and raping Fang Yang, Haynes used a knife to inflict cuts and to force or to push her off the roof of the building where he had raped her. The thrust of the defense was that the State would not be able to prove beyond a reasonable doubt the specific intent element of first degree felony murder (a capital crime) and that Haynes was guilty of only the responsive crime of second degree felony murder (not a capital crime).
We shall discuss the sufficiency of the evidence in this respect, notwithstanding that the jury’s inability to return the death penalty makes this assignment somewhat moot because Haynes’s sentence would be the same under these circumstances.
At the time of the murder, after midnight on October 26, the doors between the medical school and the BRI building were not yet *851 installed and the connecting hallways allowing access from one building to the other were insecurely partitioned only by pieces of plywood. The medical school’s video surveillance system recorded Haynes on videotape on the ninth floor of the BRI building around the time in question. Police showed the tape to the contractors working on the BRI project. Haynes’s grandfather, who was also |3his supervisor, identified him from the tape. An employee of the medical school also saw Haynes in the medical school building near the time of the murder. To police, Haynes denied involvement in the crime, but investigators found Fang Yang’s wallet hidden in the wall of Haynes’s mobile home and human blood in his automobile. Scientific tests, including DNA “fingerprinting,” later confirmed Haynes’s identity as Fang Yang’s rapist.
DISCUSSION
CCrP Art. 821(C) Motion
Haynes’s counsel frames the sufficiency assignment as “how the killing occurred and whether or not [Haynes] acted with the specific intent to kill or inflict great bodily harm upon Ms. Yang during the commission of one or more of the statutory underlying felonies.” He argues that the coroner, Dr. George McCormick, upon whose opinion the State relies, could not, “from the physical evidence,” opine whether Fang Yang’s fall from the roof was caused by the possibilities of her “stumbling,” or “struggling,” or attempting to “jump” from one building to the other or simply “falling,” or by being “pushed” [forced]. The trial court denied Haynes’s motion, based on such arguments, to reduce the verdict to second degree murder.
To affirm a conviction, an appellate court must determine whether the evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational fact finder to conclude every element of the crime was proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Martin, 93-0285 (La. 10/17/94) 645 So.2d 190; State v. Captville, 448 So.2d 676 (La.1984). LRS 15:271, 438.
|4LRS 14:30(A)(1) provides, in pertinent part:
First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, ... aggravated rape, ... [or] armed robbery. LRS 14:10 provides, in pertinent part:
(1) Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.
Intent is inferred from the circumstances of the conduct in question, whether the offender actively desired the prescribed criminal consequences to follow his act or failure to act. Whether the requisite intent is present is a question for the trier of fact, subject to review under the standards of Jackson v. Virginia, supra. State v. Johnson, 584 So.2d 1216, 1218 (La.App.2d Cir.1991), writ denied; LRS 15:271, 438.
We conclude the totality of the circumstances surrounding the homicide supports the jury’s finding that Haynes had the requisite specific intent to support the conviction for first degree murder.
Dr. McCormick characterized a series of superficial stab wounds to the victim’s upper chest area as “torture” or “coercion” wounds, the type intended either to cause pain or to force her to do something that she did not want to do. He explained that these wounds were not meant to be fatal, but were deliberate and difficult to inflict. Dr. McCormick opined that the wounds were made within 15 minutes of the victim’s death while Fang Yang was on top of or over the ledge of the roof of the BRI building.
^Numerous drops of blood were found on the ledge of the roof above where Fang Yang’s body fell, negating that she was there only for a few seconds. Droplets of what appeared to be blood were also observed in the gravel on the roof immediately adjacent to the ledge. Other blood was found on the hatchway which opened to allow access to the *852 roof. According to investigators who examined the crime scene, the gravel in the hatchway area appeared to have been “disturbed,” as compared to the gravel in other areas of the roof. Based on these circumstances, Dr. McCormick opined that most of the wounds in the victim’s neck were deliberately and carefully caused by Haynes, presumably after the rape, to force the victim to the ledge and off the roof.
The last witnesses to see the victim alive said she was on the seventh floor of the medical school at about 12:30 a.m. On the date of the murder, the BRI building could be entered from the medical school through a makeshift plywood barrier of the connecting hallway near the victim’s lab in the medical school. If Haynes only intended to rape and to rob Fang Yang, he could have done so in the seclusion of the vacant BRI building. If she was attempting to get help in Haynes’s absence after being raped and cut with a knife, it is not logical or reasonable to conclude that she would have gone on the ledge of the roof of either building or attempted to jump from one building to another to obtain assistance.
Moreover, the cross-examination of Dr. McCormick about her struggling, falling or jumping, was prefaced, in part, on the hypothesis that |s“all the knife wounds were made while [Fang Yang] was some distance from the ledge [on the roof of the BRI braiding].”
The State asserts that Haynes’s disabling of two of the five security cameras on the ninth floor of the medical school supports the finding that he had the requisite mental state. Although Haynes was ultimately apprehended after he was identified as being on the ninth floor security camera tapes just before 1:00 a.m. on the date of the murder, it is possible that deactivation of the cameras was merely his effort not to be seen during the commission of any crime. Curiously, it appears that Haynes might have avoided the cameras entirely by simply taking the victim through the seventh floor hallway partition between the BRI and the medical school then going up the BRI stairs to the roof.
When the evidence is construed in the light most favorably supporting the jury verdict, we must determine whether the arguable possibilities that Fang Yang either fell by struggling with Haynes on the roof, or by simply stumbling or trying to jump from one building to the other, are logical and reasonable. See LRS 15:438, the standard for proof by circumstantial evidence.
The fact that numerous unsmeared drops of blood were found within a relatively small space atop the ledge surrounding the roof of the braiding allowed the jury, and us, to reach the reasonable conclusion that Fang Yang’s presence on or over the ledge was not momentary so as to suggest a fall or a jump from, or a struggle while on, the ledge. Conversely, the blood atop the hatchway on the roof was partly smeared. The jury could have concluded |7that the rape occurred atop the closed hatchway on the roof and that Fang Yang suffered more cuts and bled more while on the ledge than she did while on the hatchway. On our review of the totality of the evidence, we find that the jury accepted the reasonable hypothesis or opinion of the coroner based on the evidence, factual and forensic, to the exclusion of the hypotheses of the defense which the jury obviously found unreasonable. This satisfies the sufficiency standards of LRS 15:438 and 14:10. We conclude the jury correctly found the specific intent element was proved beyond a reasonable doubt.
Ineffective Assistance of Counsel
Haynes complains that the trial court erred by forcing him to accept his attorney’s strategy in handling the case. Haynes specifically asserts that he did not want his lawyers to argue that he was guilty of any of the accusations made by the State. Haynes notified the judge of this preference, in plain language, during the opening statement of the defense. The claim of ineffective assistance of counsel is ordinarily and more properly raised in a motion for post-conviction relief. Where the record allows, however, we will, in the interest of judicial economy, consider such a claim on a direct appeal.
Only when surrounding circumstances justify a presumption of ineffectiveness can a Sixth Amendment claim be sufficient without inquiry into counsel’s actual *853 performance at trial. United States v. Cronic, 466 U.S. 648, 660, 104 S.Ct. 2039, 2048, 80 L.Ed.2d 657 (1984). Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), states the jgstandard by which to judge the contention that the Constitution requires that a conviction be overturned because of the actual ineffective assistance of counsel. Strickland, supra, at 684, 104 S.Ct. at 2063.
Where the assertion that counsel was ineffective rests on actions of counsel pertaining to the incident proceedings, the Strickland test is applicable. To successfully claim ineffective assistance of counsel, defendant must show that counsel’s performance was both deficient and specifically prejudicial to defendant.
Here counsel’s strategy was to persuade the jury against a capital verdict in the bifurcated proceedings. The State did not rely on defense counsel’s concessions. The State’s evidence was legally sufficient to prove that Haynes was engaged in one or more of the enumerated felonies in the first degree murder statute. Based on the totality of the evidence, a reasonable juror could have concluded that Haynes had committed the aggravated kidnapping, rape, and armed robbery of Fang Yang. Because the evidence (the wallet, the rape and the DNA and blood evidence) proved that Haynes committed the underlying felonies, only one of which was necessary to convict, Haynes was not prejudiced by counsel’s strategy to focus on the specific intent element and the requirement that specific intent be proved by what the circumstances indicated to the exclusion of other reasonable hypotheses of innocence. Haynes’s counsel raised hypotheses that were arguably innocent, which we have addressed.
1 9Whatever the reasons for the jury’s inability to agree on a capital verdict, Haynes’s counsel succeeded in avoiding the death sentence. We find no merit in Haynes’s pro-se assignment.
ERRORS PATENT
Haynes was told that “you have three years to pursue any post-conviction relief remedies afforded by law,” but was not told that the period of limitation begins to run from the date the judgment is final. The law requires such specificity. State v. Gladney, 626 So.2d 778 (La.App. 2d Cir.1993). This is error patent.
We direct the trial court to send appropriate written notice to Haynes within ten days of the rendition of this opinion and to cause proof of Haynes’s receipt of such notice to be filed in the record. State v. Smith, 600 So.2d 745 (La.App. 2d Cir.1992).
DECREE
The conviction is AFFIRMED.