# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 22-724

**STATE OF LOUISIANA**

**VERSUS**

**JEWEL DEMON HUMPHREY**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 755-20
HONORABLE DERRICK D. KEE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHANNON J. GREMILLION**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, Jonathan W. Perry, and Charles G. Fitzgerald, Judges.

**CONVICTION AND SENTENCE AFFIRMED.**

**Edward Kelly Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Jewel Demon Humphrey**

**Honorable Stephen C. Dwight**
**Fourteenth Judicial District Attorney**
**John E. Turner**
**Assistant District Attorney**
**P. O. Box 3206**
**Lake Charles, LA 70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**GREMILLION, Judge.**

On January 16, 2020, Defendant, Jewel Demon Humphrey, was charged by bill of indictment with second degree murder, in violation of La.R.S. 14:30.1. Defendant pled not guilty and requested a trial by jury. On October 22, 2021, defense counsel filed a notice of defense of voluntary intoxication. Defendant's trial began with jury selection on November 16, 2021. The next day, defense counsel filed a "Motion to Quash General Venire and/or Petit Jury Venire," which was denied following extensive arguments. On November 19, 2021, Defendant was unanimously found guilty of second degree murder. The trial court subsequently sentenced Defendant to the mandatory term of life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence.

On March 21, 2022, Defendant filed a notice of appeal which was granted by the trial court. Defendant is now before this court alleging four assignments of error:

1.    The evidence admitted at trial, when viewed in the light most favorable to the prosecution, was insufficient to prove beyond a reasonable doubt that Jewel Demon Humphrey was guilty of second degree murder.

2.    The Court erred in denying Defense Counsel's Motion to Quash the General Venire and/or Petit Jury Venire.

3.    The Court erred in allowing the introduction of excessive and/or gruesome crime scene/autopsy photographs over Defense counsel's objections.

4.    It was an abuse of the Court's discretion when it denied Defense counsel's challenge for cause regarding Prospective Juror Ms. Sandra Matthews.

For the following reasons, Defendant's conviction and sentence are affirmed.

**FACTS**

Around midnight on October 15, 2019, Mya Guillory called 911 to request emergency services for her mother, Robbie Vital.[1] At trial, Mya explained she had been at Ms. Vital's home on October 14, 2019, with her brother, Jason; her sister, Daisha; and Daisha's two young children. That night, Defendant asked Ms. Vital if he could spend the night at her house. They had been dating for about two years at the time. According to Mya, Defendant and Ms. Vital went into her mother's bedroom at approximately 10:00 p.m., where they smoked PCP and drank alcohol.

Mya testified that she went to sleep but was awoken shortly before midnight to the sounds of a headboard hitting a wall and a muffled plea for help. Mya ran to Ms. Vital's bedroom where she saw Defendant on top of Ms. Vital, and he was striking her head with his hand. When Defendant saw Mya, he hit her in the jaw and then closed the bedroom door, locking her out. Mya and Jason tried to force open the bedroom door, but when they were unable to do so, they ran outside and used a passing driver's cell phone to call 911. Upon reentering the home, Mya and Jason noticed the bedroom door was again open and saw Defendant stomping downward on Ms. Vital's face. Mya testified that Defendant turned towards them and threw down a knife which broke into two pieces after hitting the ground. Defendant then said, "I killed the bitch. She's dead." Defendant walked outside and began pacing on the front porch, repeatedly asking himself, "What did I do?" Defendant took off running down the street before officers arrived on the scene.

Officer Houston Boyt with the Lake Charles Police Department testified as one of the first responding officers. Officer Boyt was dispatched to 1909 Tousand

---

[1]The bill of indictment identified the victim as Robbie Watson a/k/a Robbie Vital. For consistency purposes, we will refer to the victim as Ms. Vital as that is how she was referred to throughout trial.

Street, and upon entering the residence, he noticed blood in the hallway leading to the bedroom and heard Ms. Vital struggling to breathe. Ms. Vital was lying in a pool of blood on the bedroom floor underneath pieces of furniture. Officer Boyt removed the furniture from Ms. Vital and then assisted emergency medical personnel in removing her from the bedroom. Because they were unable to maneuver a stretcher in the residence, they dragged Ms. Vital from the bedroom, down the hallway, and towards the front door. Officer Boyt located the shattered knife in the bedroom, and he later found another bloody pocketknife on the kitchen counter. Officer Boyt's bodycam footage was played for the jury.

The State called Sergeant Bendy Falcon with the Lake Charles Police Department. As the officer who arrived on the scene first, Sergeant Falcon observed bloody shoeprints in the residence and the ransacked bedroom. At approximately 1:00 a.m., Defendant placed a 911 call to turn himself in, and he provided his location to the 911 operator. Sergeant Falcon and Officer Jackson went to Defendant's location, which was approximately one mile from 1909 Tousand Street.[2] The officers found Defendant standing in the middle of the street waiting for their arrival. Defendant complied with their orders to kneel on the ground, to show his hands, and to put his hands behind his back. Defendant told the officers he had smoked PCP with Ms. Vital, the pair had engaged in sexual intercourse, and then Ms. Vital "tripped out." While placing Defendant under arrest, the officers noticed he had blood on his hands from an injury. Defendant was transported to St. Patrick's Hospital for treatment, during which time he asked the officers if Ms. Vital was going to jail. When the officers said that she was at the hospital, Defendant told them, "It was a blur." Ms. Vital succumbed to her injuries on October 17, 2019.

---

[2]Officer Jackson's bodycam footage was played for the jury during Sergeant Falcon's testimony.

Officer Jessica Single testified as an evidence officer with the Lake Charles Police Department. Officer Single was initially dispatched to Memorial Hospital to take photographs of Ms. Vital, who was still alive at the time, and then she took photographs of the crime scene. Officer Single collected the shattered knife and the pocketknife at the crime scene. Finally, Officer Single went to St. Patrick's Hospital to take photographs of Defendant documenting the injury to his hand. Several of the photographs were entered into evidence.

The State called Doctor Patrick Hayes, who was accepted as an expert in forensic psychiatry and addiction medicine. Dr. Hayes explained that phencyclidine or PCP usually has a four-hour window of intoxication. Dr. Hayes testified that the duration of PCP's effects can be reduced in habitual users, and users of PCP have varied responses in how long it takes the drug to affect them, in the duration of the effects, and in their tolerance levels. According to Dr. Hayes, a low dosage of PCP is "more of an anesthetic" that makes the user feel "chill and tired," whereas a high dosage of PCP can yield a "superiority complex [and] irritability." Because there was no drug screen performed on Defendant, Dr. Hayes could not determine Defendant's precise level of intoxication. Dr. Hayes's assessment of Defendant's intoxication level was made based on the following events: according to Mya, Defendant and Ms. Vital retired to her bedroom to smoke PCP around 10:00 p.m.; Mya's initial 911 call was made around 12:00 a.m.; Defendant's 911 call was made around 1:00 a.m.; and Defendant was arrested shortly thereafter. In his 911 call, Defendant identified himself, gave the exact location of where the incident occurred, and told the operator he would turn himself in to the Lake Charles Police Department. Dr. Hayes determined Defendant's speech was intelligible, was not slurred, was not dysarthric, and was easily understandable. Dr. Hayes watched the bodycam footage of Defendant's arrest and testified that Defendant presented

4

himself appropriately and followed the officers' commands. Dr. Hayes thought Defendant looked tired at the time of his arrest, but he was not acting like "a wild bear in the woods." Dr. Hayes testified that Defendant should have been equally intoxicated at the time of his 911 call and at the time of arrest as he was at the time of the incident. In his expert opinion, Dr. Hayes believed Defendant had the ability to reason and understand his actions.

Dr. Terry Welke, the Calcasieu Parish Coroner, was qualified as an expert in forensic pathology. Dr. Welke performed the autopsy, and he noted abrasions, bruises, and lacerations to Ms. Vital's face and body. Specifically, there was a laceration in front of the left ear, discoloration to the left eyelid, discoloration and skin scraping to the right side of the head, bruising on the right breast, and a patterned abrasion on the left shoulder. Ms. Vital's jaw and nasal bones were fractured, and she suffered a subdural hemorrhage, which is bleeding between the surface of the brain and the thick membrane surrounding it. Ms. Vital was stabbed underneath the right breast, but Dr. Welke testified the stab was not deep enough to penetrate the chest wall, thereby resulting in a nonfatal injury.[3] Dr. Welke concluded the manner of death was homicide and the cause of death was blunt force injuries to the head.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. There is one error patent.

The trial court incorrectly advised Defendant that the two-year time limitation for filing an application for post-conviction relief ran from the date of sentencing. The trial court stated, "You have two years, just as anyone else, to file, from today's date, to file any application for post-conviction relief."

---

[3]The broken knife found in the bedroom was DNA tested. Blood on both the blade and the handle were consistent with Ms. Vital's DNA. The handle of the knife had a major contributor, Ms. Vital, and a minor contributor, but the minor contributor sample was too small to interpret.

5

According to La.Code Crim.P. art. 930.8, the prescriptive period for filing an application for post-conviction relief is two years but it begins to run when a defendant's conviction and sentence become final under the provisions of La.Code Crim.P. arts. 914 or 922. Thus, the trial court is directed to correctly inform Defendant of the provisions of Article 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and filing written proof in the record that Defendant received the notice.

## ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, Defendant challenges the sufficiency of the evidence presented at trial. Defendant does not contest that he killed Ms. Vital. Rather, Defendant argues his state of intoxication, caused by his drug and alcohol consumption, rendered him incapable of forming the requisite specific intent for second degree murder. Alternatively, Defendant argues he was provoked such that a responsive verdict of manslaughter should be entered. Therefore, according to Defendant, his conviction for second degree murder should be reversed.

Before addressing the merits of Defendant's arguments, we will set forth the applicable standard of review:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La. 1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See Graffagnino*, 436 So.2d at 563, *citing State v. Richardson*, 425 So.2d 1228 (La.1983). To obtain a

conviction, the elements of the crime must be proven beyond a reasonable doubt.

*State v. Freeman,* 01-997, pp. 2-3 (La.App. 3 Cir. 12/12/01), 801 So.2d 578, 580.

Furthermore, the testimony of a single witness is sufficient to support a conviction "[i]n the absence of internal contradiction or irreconcilable conflicts with physical evidence." *State v. Dixon,* 04-1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936. The trier of fact may accept or reject the testimony of any witness, and the determination of the credibility of that witness, in whole or in part, is left to its sound discretion and "will not be re-weighed on appeal." *Id.* at 936.

*State v. F.B.A.,* 07-1526, pp. 1-2 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, 1009,

*writ denied,* 08-1464 (La. 3/27/09), 5 So.3d 138.

As for appellate review in cases relying on circumstantial evidence, this court

has stated the following:

When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir.1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams*, 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

*State v. Baumberger*, 15-1056, pp. 10-11 (La.App. 3 Cir. 6/1/16), 200 So.3d 817,

826-27, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859, *cert. denied*, ___ U.S.

___, 138 S.Ct. 392 (2017).

*Voluntary Intoxication Defense*

Louisiana Revised Statutes 14:30.1(A)(1) defines second degree murder, in

pertinent part, as a killing committed "[w]hen the offender has a specific intent to

7

kill or to inflict great bodily harm[.]" Specific criminal intent is the "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Voluntary intoxication is a defense to a specific intent offense if the circumstances demonstrate the intoxication precluded the formation of the requisite intent. La.R.S. 14:15(2); *State v. Legrand*, 02-1462 (La. 12/3/03), 864 So.2d 89, *cert. denied*, 544 U.S. 947, 125 S.Ct. 1692 (2005).

In *State v. Johnson*, 18-523, p. 10 (La.App. 3 Cir. 2/6/19), 265 So.3d 1034, 1043-44, *writ denied*, 19-312 (La. 5/28/19), 273 So.3d 314, this court described the voluntary intoxication defense as follows:

> The supreme court in *State v. Mickelson*, 12-2539, pp. 6-7 (La. 9/3/14), 149 So.3d 178, 183 (footnote omitted) (citations omitted), sets out the standard for proving an intoxication defense:
>
>> Voluntary intoxication will not excuse a crime, but it is a defense to a specific intent offense if the circumstances demonstrate that intoxication precluded formation of the requisite intent. The defendant has the burden of proving his intoxication defense; thereafter, it falls to the state to negate that defense by showing beyond a reasonable doubt that specific intent was present despite the defendant's alleged intoxication. Whether voluntary intoxication in a particular case is sufficient to preclude specific intent is a question to be resolved by the trier of fact.
>
> "Because it is a state of mind, specific intent need not be proven as a fact, but may be inferred from the circumstances and the defendant's actions. Specific intent may be formed in an instant." *Id.* at 182. "[W]here the jury has heard all the evidence and received the proper instructions from the trial judge regarding an intoxication defense, its verdict should not be impinged upon absent an abuse of the jury's discretion." *State v. Smith*, 95-1171, p. 4 (La.App. 3 Cir. 4/24/96), 677 So.2d 458, 461 (citations omitted).

At trial, Defendant argued the affirmative defense of voluntary intoxication to the jury, as he reargues to this court. Some of the State's witnesses testified that they believed Defendant to be high on the day of the incident as reflected by his

demeanor. This corroborates Defendant's statements during his arrest that he had smoked PCP with Ms. Vital. However, the mere fact that he was high is not sufficient to negate specific intent. Defendant's intoxication must have been so severe that it precluded his ability to form specific intent for his intoxication to be an affirmative defense. La.R.S. 14:15(2); *Mickelson*, 149 So.3d 178. The evidence submitted at trial does not establish with certainty how much PCP and alcohol Defendant consumed. Defendant did not present any expert testimony or testify himself regarding his level of intoxication nor did he make any statements immediately following the incident which might indicate he was too intoxicated to know or understand what occurred. In fact, Defendant was able to interact with the 911 operator and was cognizant enough to realize the gravity of the situation following the incident, as he requested aid for Ms. Vital. He was able to provide Ms. Vital's address and told the 911 operator he would turn himself in to the appropriate authorities. Defendant also cooperated with the arresting officers and was capable of following their commands. Dr. Hayes determined, after viewing the bodycam footage, that Defendant "did everything in an appropriate, consistent, coherent, logical, externally plausible fashion, and there was nothing out of sorts in his reactions." After reviewing the evidence, Dr. Hayes concluded Defendant was not so intoxicated that he lacked the ability to reason or understand his actions.

As noted above, whether a defendant's intoxication is sufficient to negate specific intent is a question for the trier of fact. *Id.* In this case, the jury weighed the evidence presented and agreed with Dr. Hayes's uncontradicted expert opinion that Defendant had the ability to reason and make decisions. Therefore, the jury found Defendant failed to meet his burden of proving his state of intoxication by a preponderance of the evidence.

Even assuming *arguendo* that Defendant had presented sufficient evidence to prove intoxication and shift the burden to the State to negate that defense, the State presented sufficient evidence to establish beyond a reasonable doubt that specific intent was present despite the alleged intoxication. *See State v. Veillon*, 19-606 (La.App. 5 Cir. 7/29/20), 297 So.3d 1091, *writ denied*, 20-1297 (La. 2/9/21), 310 So.3d 178. "Specific criminal intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant." *State v. Maxie*, 93-2158, p. 11 (La. 4/10/95), 653 So.2d 526, 532. The evidence adduced at trial showed that Defendant got on top of Ms. Vital, repeatedly beat her, stabbed her with a kitchen knife, and stomped on her head. Immediately afterwards, Defendant told Ms. Vital's children, "I killed the bitch. She's dead." Based on the severity of the injuries, Defendant's actions demonstrated his specific intent to kill or inflict great bodily harm upon Ms. Vital.

We find that it was reasonable for the jury to have concluded that Defendant did not prove by a preponderance of the evidence that intoxication precluded him from forming the specific intent to kill Ms. Vital. We find the evidence was sufficient to support the second degree murder guilty verdict.

*Responsive Verdict of Manslaughter*

In Defendant's alternative argument, he contends the evidence presented at trial supports that he is guilty of manslaughter. He suggests that this court could find that the facts support a conviction for manslaughter which is defined, in pertinent part, as:

> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually

cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

La.R.S. 14:31(A)(1). In *State v. Stewart*, 00-143, pp. 3-4 (La.App. 3 Cir. 10/4/00), 771 So.2d 723, 726, *writ denied*, 00-3135 (La. 11/2/01), 800 So.2d 866, this court discussed the responsive verdict of manslaughter as follows:

> When the fact finder, in this case, the judge, finds the elements of second degree murder, it then must be determined whether the circumstances indicate the crime was actually manslaughter. *State v. Jack,* 596 So.2d 323 (La.App. 3 Cir.), *writ denied,* 600 So.2d 611 (La.1992). To reduce second degree murder to manslaughter, a defendant must present evidence to show by a preponderance that the homicide was committed in "sudden passion" or "heat of blood" immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. *State v. Lee,* 498 So.2d 1177 (La.App. 3d Cir.1986), *writ denied,* 504 So.2d. 874 (La.1987). "Sudden passion" and "heat of blood" are not elements of the crime of manslaughter. They are factors which mitigate against finding a defendant as culpable as a person who commits a homicide without the occurrence of any extenuating event. *State v. Lombard,* 486 So.2d 106 (La.1986).

On appeal, the question for the reviewing court is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the mitigating factors were not established by a preponderance of the evidence. In brief to this court, appellate counsel asserts this is not a case where one individual is significantly bigger than the other, and both Defendant and Ms. Vital were under the influence of drugs and alcohol at the time of the incident. Appellate counsel speculates there was some sort of catalyst during their "night of debauchery," which led to Defendant's hand being injured and then to Ms. Vital's death.

However, as the State correctly argues, there was little evidence presented of provocation by Ms. Vital. In closing arguments, defense counsel surmised that Ms. Vital may have mentioned one of her ex-boyfriends, which sent Defendant into a jealous rage or upset Defendant in his intoxicated state. Arguments of counsel are

11

not evidence. Further, even accepting defense counsel's assertion, it is well-settled that "an argument alone will not be a sufficient provocation in order to reduce a murder charge to manslaughter." *State v. Charles,* 00-1611, p. 4 (La.App. 3 Cir. 5/9/01), 787 So.2d 516, 519 (citations omitted), *writ denied,* 01-1554 (La. 4/19/02), 813 So.2d 420. Nothing in the record suggests Ms. Vital initiated the confrontation, provoked Defendant, or engaged in aggressive behavior. Viewing the evidence in a light most favorable to the prosecution, a rational jury could have found that Defendant failed to show by a preponderance of the evidence that he acted in sudden passion or heat of blood to justify the lesser verdict of manslaughter.

Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, Defendant contends the trial court erred in denying his "Motion to Quash General Venire and/or Petit Jury Venire" without giving defense counsel the opportunity to present additional evidence at the hearing. Defendant asserts he was denied a jury comprised of a fair cross-section of his community because African Americans are systematically underrepresented in Calcasieu Parish jury pools. In contrast, the State argues that Defendant failed to provide adequate evidence that African American jurors were intentionally and systematically excluded from the jury venires in Calcasieu Parish. In the State's view, Defendant failed to allege any fact upon which the venire could be set aside. Therefore, the motion to quash did not set forth a sufficient basis to warrant an evidentiary hearing.

As the State observes, the selection of a petit jury from a fair cross-section of the community is an essential component of the Sixth Amendment right to a jury trial. *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692 (1975). The proper procedural mechanism for alleging that "[t]he general venire or the petit jury venire was

12

improperly drawn, selected, or constituted" is a motion to quash. La.Code Crim.P. art. 532(9). In *State v. Brown*, 18-1999, pp. 112-14 (La. 9/30/21), 330 So.3d 199, 281-82, *cert. denied*, ___ U.S. ___, 142 S.Ct. 1702 (2022), the supreme court set forth the burden of proof in a fair cross-section claim:

> Under La. C.Cr.P. art. 419(A), "A general venire, grand jury venire, or petit jury venire shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically excluded from the venires solely upon the basis of race." The burden of proof "rests on defendant to establish purposeful discrimination in the selection of grand and petit jury venires." *State v. Lee*, 559 So.2d 1310, 1313 (La. 1990) [*cert. denied*, 499 U.S. 954, 111 S.Ct. 1431 (1991)]; *State v. Loyd*, 489 So.2d 898, 903 (La. 1986); *State v. Liner*, 397 So.2d 506, 516 (La. 1981); *State v. Manning*, 380 So.2d 54, 57 (La. 1980); *State v. Sheppard*, 350 So.2d 615, 651 (La. 1977). As noted above, *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979), provides the following:
>
> > In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.
>
> Courts typically evaluate the degree of underrepresentation using the "absolute disparity" measure (the difference in the percentage of the group in the jury pool and the percentage of the group in the jury-eligible population), the "comparative disparity" measure (the ratio of the absolute disparity to the distinctive group's representation in the jury-eligible population), or a standard deviation analysis, but have not established a specific qualifying degree of underrepresentation. *Berghuis v. Smith*, 559 U.S. 314, 329, 130 S.Ct. 1382, 1393, 176 L.Ed.2d 249 (2010). Additionally, defendants must demonstrate the mechanism by which the jury selection process works to systematically exclude the distinct group and cannot "make out a prima facie case merely by pointing to a host of factors that, individually or in combination, *might* contribute to a group's underrepresentation." *Id.*, 559 U.S. at 332, 130 S.Ct. at 1395.
>
> We find defendant does not establish entitlement to relief on this basis. Nothing in the record suggests that African-Americans were in fact underrepresented in the venire in this case or that Lafourche Parish systematically excludes this group in its jury selection process.

Defendant does not dispute that Lafourche Parish jury pools are selected randomly from a combination of voter registration rolls and DMV records, and he does not demonstrate, or even speculate, how this method of venire selection would systematically exclude African-Americans. While he cites the summoning of deceased and non-resident jurors as a potential cause of the alleged disparity, he provides no explanation as to how this would contribute to the underrepresentation of African-Americans in particular. Additionally, as defendant only provides questionable data regarding his own venire, it is impossible to determine the proportion of African-Americans represented in Lafourche Parish venires generally. As such, defendant fails to show "systematic exclusion" of a distinct group and is therefore not entitled to relief. *State v. Turner*, 16-1841 (La. 12/5/18), 263 So.3d 337, 394, *reh'g denied* (1/30/19); *see, e.g., Moore v. Cain*, No. CV 14-0297-JJB-EWD, 2017 WL 4276934, at *8 (M.D. La. Sept. 7, 2017), *report and recommendation adopted,* No. CV 14-297-JJB-EWD, 2017 WL 4275903 (M.D. La. Sept. 26, 2017) (unpub'd) ("The mere fact that one particular jury venire may exhibit disproportionality does not in any sense amount to proof that the State's system of constituting its central jury pool is unconstitutional or leads to the systematic exclusion of any particular group from the jury-selection process.").

In this case, defense counsel filed the motion to quash on November 17, 2021. Defense counsel acknowledged in open court that the motion itself did not satisfy the prima facie requirements in *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664 (1979), as it lacked any evidentiary support for his claim. Defense counsel indicated he intended to call an individual from the Fourteenth Judicial District Court Clerk of Court's Office to testify regarding the jury venire composition in this case and the jury composition process in general. The trial court took judicial notice of what the individual's testimony would entail and instructed defense counsel to make his arguments.

Defense counsel argued African Americans were being excluded from the general venires in Calcasieu Parish, and African Americans fit in a distinctive group in the community under *Duren*. Distinctions based on race or national origin clearly meet the "distinctive group" test. *See Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272 (1977); *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667 (1954).

14

The second prong under *Duren* requires the defense to prove that the representation of the excluded group in general venires from which juries are selected is not fair and reasonable in relation to the number of the group members in the community. According to the defense, data from the United States Census Bureau showed the population of Calcasieu Parish in 2019 was comprised of approximately 25.8% African Americans. Of the fifty individuals in the jury pool in this case, there were only eight African Americans or 16%. Thus, defense counsel claimed there was an absolute disparity of 9.9% in the representation of African Americans in the general venire in this case. The State claimed the defense did not provide enough statistical data to support his fair cross-section claim. Though the defense provided some data regarding the racial makeup of this venire, he did not provide any data of the racial makeup of Calcasieu Parish venires generally.

Regarding the third prong under *Duren*—that the underrepresentation is due to systematic exclusion of the group in the jury-selection process—defense counsel described that Calcasieu Parish jury pools are selected randomly from the voter registration rolls. Defense counsel then argued that because the State of Louisiana, and Calcasieu Parish particularly, has historically and continuously disenfranchised the African American voter population, African Americans are systemically excluded from the jury-selection process based on this method of venire selection. That racist power structure, according to defense counsel, resulted in African Americans being underrepresented in Calcasieu Parish jury venires.

After extensive arguments, the trial court determined more evidentiary data was needed before a ruling could be made because there was not enough evidence in the record. However, before the trial court ruled on the motion, the State admitted a jailhouse call Defendant made the night prior wherein he told one of his friends to go to a prospective juror's house. In the call, Defendant implicitly instructed his

15

friend to influence or intimidate the prospective juror, an African American. The trial court excused the prospective juror for cause, and thereafter denied the motion to quash:

> In addition, when the defendant comes in and makes an argument that there's systematic exclusion of jurors of a certain race, and then someone finds out that people are systematically themselves excluding a juror by trying to intimidate or influence them, that is not [an] appropriate argument to make in this case. That motion is denied. The motion to quash is denied.

In brief to this court, Defendant alleges he "should have been allowed to present additional evidence indicating the jury pool did not represent a fair cross-section of the African American community." In contrast, the State argues the motion to quash lacked any statistical evidence to meet the *Duren* prima facie requirements, defense counsel was given ample opportunity to present arguments at the hearing, and the trial court did not abuse its discretion in denying the motion without further proceedings.

As discussed, the burden of proof rests solely with the defense. The defense failed to make a prima facie showing of discrimination as there were no allegations of fraud, and the record is devoid of any indications of such, or that some great wrong was committed that would work irreparable injury to Defendant. La.Code Crim.P. art. 419(A). Louisiana Code of Criminal Procedure Article 408.1(A) specifically permits the exclusive use of voter registration rolls for general jury venires. Courts have consistently held that the "use of voter registration lists as the sole source from which a venire is compiled is a constitutionally sound practice unless the defendant can show that such a practice discriminates against a certain class of persons to the extent that the venire does not represent a fair cross-section of the community." *See State v. Smith*, 17-1333, p. 10 (La.App. 1 Cir. 2/21/18) (unpublished opinion)[4] (citing

_____

[4] 2018 WL 1007350.

16

*State v. Berry*, 95-1610 (La.App. 1 Cir. 11/8/96), 684 So.2d 439, 446, *writ denied*, 97-278 (La. 10/10/97), 703 So.2d 603), *writ denied*, 18-405 (La. 2/18/19), 265 So.3d 771; *State v. Tucker*, 49,950, 49,822, p. 33 (La.App. 2 Cir. 7/8/15), 170 So.3d 394, 417. Although defense counsel established the first prong of *Duren*—that the group alleged to be excluded was a "distinctive" group in the community—he did not establish the second or third prongs of *Duren*. The motion did not address any cases or establish "systematic exclusion" other than the defense's argument that Calcasieu Parish's use of the voter rolls systematically excludes African Americans from the jury venires. After a review of the record, we find Defendant failed to show systematic exclusion in the venire, and consequently, this assignment of error is meritless.

### ASSIGNMENT OF ERROR NUMBER THREE

In his third assignment of error, Defendant contends the trial court erred "in allowing the introduction of excessive and/or gruesome crime scene/autopsy photographs over [d]efense counsel's objection, some of which do not reflect the condition of the home at the time of the crime." Defendant argues that because it was undisputed that he caused Ms. Vital's death, the State did not need to establish that fact through their introduction of cumulative photographs, and therefore, the prejudicial value of the photographs outweighed their probative value. Regarding the crime scene photographs, Defendant speculates the gruesome photographs were introduced only "to inflame the jury."

The supreme court reviewed the issue of gruesome photographs in *State v. Broaden*, 99-2124, pp. 22-24 (La. 2/21/01), 780 So.2d 349, 364, *cert. denied*, 534 U.S. 884, 122 S.Ct. 192 (2001):

> Defendant complains of the admission of three gruesome photographs. Defendant argues that as both victims would have died from bullets fired by Adams, the probative value of this evidence is

slight and was introduced solely to inflame jurors and incite them to convict based on the pictures. Objections were raised before trial.

The state is entitled to the moral force of its evidence, and post-mortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, as well as location and placement of wounds and to provide positive identification of the victim. *State v. Koon,* 96–1208, p. 34 (La.5/20/97), 704 So.2d 756, 776; *State v. Martin,* 93–0285, p. 14 (La.10/17/94), 645 So.2d 190, 198. Photographic evidence will be admitted unless it is so gruesome as to overwhelm jurors' reason and lead them to convict without sufficient other evidence. *Koon,* 96–1208 at p. 34, 704 So.2d at 776, citing *State v. Perry,* 502 So.2d 543, 558–59 (La.1986), *cert. denied,* 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987).

We agree that the photographs are indeed gruesome. This court regularly sees claims of "gruesome" photographs in capital cases, but has reversed only once on these grounds in any case. *State v. Morris,* 245 La. 175, 157 So.2d 728 (1963) (gratuitous introduction of "gruesome and ghastly" photographs depicting the progress of an autopsy in an "increasing grotesque and revolting" manner constituted reversible error when the defendant admitted that he killed the victim and contested only his state of mind). Admission of "gruesome photographs is not reversible error unless it is clear that their probative value is substantially outweighed by their prejudicial effect." *Martin,* 93-0285 at pp. 14-15, 645 So.2d at 198. *Cf., State v. Wessinger,* 98-1234, pp 16-17 (La.5/28/99), 736 So.2d 162, 179 (photographic evidence "will be admitted unless it is so gruesome as to overwhelm the jurors' reason and lead them to convict defendant absent other sufficient evidence.")

We do not find any reason to treat photographic evidence differently than any other evidence, which is admissible if relevant and more probative than prejudicial. La.Code Evid. art. 403. At any rate, we find that the admission of the disputed photographs in this case was gratuitous. The pathologist could have given verbatim testimony illustrated by other, less graphic photos. While the state is certainly entitled to the moral force of its evidence, that evidence should enlighten rather than bludgeon the jury. The photographs taken at the crime scenes were sufficient to demonstrate the cause of death as well as the location of the gunshot wounds. However, we do not find reversible error.

*Crime Scene Photographs*

At trial, the State sought to introduce twenty-nine crime scene photographs.

Defense counsel objected to sixteen of the photographs on the basis that they did not

accurately depict the crime scene at the time of the incident and lacked any probative

value.  The admission of the photographs was discussed at a pretrial hearing and again during the testimony of Officer Single.  Of principal concern, defense counsel argued the photographs—which were taken after the officers and emergency medical personnel dragged Ms. Vital from her bedroom to the front of the residence to render aid—depicted the crime scene as prejudicially gruesome.  Defense counsel remarked that the photographs showed blood trails on the floor, bloody shoeprints throughout the residence, and smears of blood on the walls.  The State argued the photographs were probative to familiarize the jury with the crime scene and to give context to witness testimony regarding the layout of the residence.  Additionally, the State noted there were no photographs taken at the crime scene before Ms. Vital was moved due to the emergent circumstances.  The State sought to assuage the defense's concerns by calling Officer Boyt to testify first and playing his bodycam footage before introducing the crime scene photographs.  The bodycam footage showed the condition of the crime scene as Officer Boyt, one of the first responding officers, arrived on scene, and it showed Ms. Vital being moved for emergency aid purposes.  In its ruling, the trial court stated:

> THE COURT:
> . . . . I don't find the photos to be prejudicial; and I do think that if they are slightly prejudicial, the probative value far outweighs the prejudicial effect.
>
> There are other photos that are far more gruesome than this stream of blood.  I don't think that's what's going to produce [sic] the jury.  For those reasons I deny the motion.

Generally, photographs are "'admissible if they illustrate any fact, shed any light upon an issue in the case, or are relevant to describe the person, thing or place depicted.'"  *State v. Brown*, 16-998, p. 108 (La. 1/28/22), 347 So.3d 745, 822 (quoting *State v. Jackson*, 30,473, p. 15 (La.App. 2 Cir. 5/13/98), 714 So.2d 87, 96, *writ denied*, 98-1778 (La. 11/6/98), 727 So.2d 444).  Our review of the crime scene

photographs indicates that several of the photographs did not shed additional light on the layout of the residence as the State suggests but, rather, focused on the trail of blood which was not caused from Defendant's actions. However, we cannot say the trial court abused its discretion in admitting the photographs in question. Any prejudicial effect of the photographs' admission was alleviated by the publication of the bodycam footage. It is well-settled that "[t]he trial court has considerable discretion in the admission of photographs, and its ruling will not be disturbed in the absence of an abuse of that discretion." *State v. Critton*, 52,058, p. 9 (La.App. 2 Cir. 8/22/18), 251 So.3d 1281, 1289 (citation omitted), *writ denied*, 18-1515 (La. 2/25/19), 266 So.3d 292.

*Autopsy Photographs*

The State introduced six autopsy photographs during Dr. Welke's testimony, and defense counsel objected to three of the photographs as cumulative and unduly prejudicial. The photographs at issue were State's Exhibit 15-A (front view of Ms. Vital's face), State's Exhibit 15-B (right side view of Ms. Vital's face), and State's Exhibit 15-C (left side view of Ms. Vital's face). The State contended the photographs showed the injuries suffered by Ms. Vital, corroborated Dr. Welke's testimony regarding the cause and manner of death, and demonstrated Defendant had the specific intent to kill or inflict great bodily harm based on the severity of the attack and where the wounds were located. Because Dr. Welke determined the cause of death was blunt force injuries to the head, the State asserted the photographs were relevant to depict those injuries.

In *State v. Brown*, 330 So.3d at 244 (citations omitted), the supreme court observed:

> Even when the cause of death is not at issue, the State is entitled to the moral force of its evidence, and postmortem photographs of murder victims are generally admissible to prove corpus delicti, to

20

corroborate other evidence establishing cause of death, location, placement of wounds, or positive identification of the victim.

Therefore, given the State's burden of proving Defendant had the specific intent to kill or inflict great bodily harm and the highly relevant nature of each of the photographs to demonstrate the extent and placement of Ms. Vital's injuries and her cause and manner of death, the trial court did not abuse its discretion in admitting the photographs. This assignment of error lacks merit.

### ASSIGNMENT OF ERROR NUMBER FOUR

In his fourth assignment of error, Defendant argues the trial court abused its discretion in denying his challenge for cause of prospective juror Sandra Matthews. In contrast, the State argues there was no valid ground to challenge Ms. Matthews, despite defense counsel's arguments that she may not be able to be impartial. Alternatively, the State asserts that even if Ms. Matthews' statements suggested partiality, the trial court did not abuse its discretion in denying the challenge for cause after finding she was sufficiently rehabilitated.

As a preliminary matter, it must be determined whether this issue was preserved for review, as defense counsel failed to lodge an objection to the trial court's denial of the challenge for cause. In *State v. Clark*, 12-508, p. 99 (La. 12/19/16), 220 So.3d 583, 663, *cert. granted, judgment vacated on other grounds,* ___ U.S. ___, 138 S.Ct. 2671 (2018), the supreme court stated:

> [Louisiana Code of Criminal Procedure Article] 800(A) requires an objection at the time of the ruling, which denies a challenge for cause, in order to preserve the claim for appellate review. Article 800(A) also mandates that the nature of the objection and the grounds therefor be stated at the time of the objection. With respect to that provision, this court has made clear:
>
>> Our law is also settled that an objection need not be raised by incantation. "It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court,

21

and the grounds therefor." C.Cr.P. 841; **State v. Boutte**, 384 So.2d 773 (La. 1980). The requirement that objection be raised contemporaneously is not meant to be inflexible, but is designed "to promote judicial efficiency and to insure fair play." **State v. Lee**, 346 So.2d 682, 684 (La. 1977). Article 800 should not be read to differ in this respect from Article 841.

**State v. Vanderpool**, 493 So.2d 574, 575 (La. 1986).

In *Clark*, the supreme court found that the defendant could not assign error to the denial of a challenge for cause, as he failed to lodge a contemporaneous objection to the trial court's ruling. Likewise, in *State v. Anderson*, 06-2987, p. 28 (La. 9/9/08), 996 So.2d 973, 996, *cert. denied*, 556 U.S. 1165, 129 S.Ct. 1906 (2009), our supreme court cited La.Code Crim.P. art. 800 and stated that "[a] defendant must object at the time of the ruling on the refusal to sustain a challenge for cause of a prospective juror." This court reached the same result in *State v. Batiste*, 15-100, p. 5 (La.App. 3 Cir. 6/3/15), 165 So.3d 1262, 1266.

However, this court has not always strictly adhered to that rule. In *State v. Queen*, 17-599 (La.App. 3 Cir. 1/4/18), 237 So.3d 547, *writ denied*, 18-211 (La. 11/20/18), 257 So.3d 186, and *State v. Record*, 18-614 (La.App. 3 Cir. 2/27/19), 266 So.3d 592, this court determined that a defendant's failure to object to the denial of challenges for cause did not prohibit review of the issue on appeal. In both cases, this court quoted *State v. Pinion*, 06-2346, p. 10 (La. 10/26/07), 968 So.2d 131, 136 (per curiam), for the following rule: "*In jury selection, counsel satisfies the requirements of Louisiana's contemporaneous objection rule by stating his grounds for a cause challenge and then by removing the juror with one of his remaining peremptory challenges when the court declines to excuse the juror for cause*." *Queen*, 237 So.3d at 563; *Record*, 266 So.3d at 602.

Therefore, this court could follow *Clark*, 220 So.3d 583, and *Anderson*, 996 So.2d 973, and hold that Defendant may not seek review of the trial court's denial

22

of his challenge for cause due to his failure to object to the ruling.[5]  However, we will follow the directive in *Pinion*, 968 So.2d 131, and review the denial of the challenge for cause in line with previous decisions in *Queen*, 237 So.3d 547, and *Record*, 266 So.3d 592.  Although defense counsel did not lodge an objection, he did set forth his reasons for the challenge for cause and later exercised a peremptory challenge when the challenge for cause was denied.

In *State v. Hamilton*, 16-587, pp. 6-7 (La.App. 3 Cir. 4/5/17), 216 So.3d 367, 373-74, *writ denied*, 17-865 (La. 2/9/18), 236 So.3d 1260, this court discussed the standard of reviewing the trial court's denial of a challenge for cause:

> In a third circuit case with a defendant of the same last name, *State v. Hamilton*, 12-204, pp. 4-5 (La.App. 3 Cir. 11/20/13), 127 So.3d 76, 79-80, *writ denied*, 13-2925 (La. 5/30/14), 140 So.3d 1173, this court discussed issues of a trial court's denial of challenges for cause, as follows:
>
>> A trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the entire voir dire reveals the trial judge abused its discretion. . . .
>>
>> "A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied."  However, a trial court does not abuse its discretion when it refuses to excuse a prospective juror on the ground he is not impartial where, after further inquiry or instruction, the potential juror has demonstrated a willingness and ability to decide the case impartially according to the law and evidence.  Thus, to establish reversible error warranting reversal of a conviction and sentence, defendant must demonstrate "(1) erroneous denial of a challenge for cause; and (2) the use of all his peremptory challenges."
>> In the instant case, it is undisputed that defense counsel

---

[5]The first circuit has consistently held that appellate review of a denial of a challenge for cause is not preserved unless a defendant lodged a contemporaneous objection to the trial court's ruling.  *See, e.g.*, *State v. Mills*, 13-573 (La.App. 1 Cir. 8/27/14), 153 So.3d 481, *writ denied*, 14-2027 (La. 5/22/15), 170 So.3d 982, *and writ denied*, 14-2269 (La. 9/18/15), 178 So.3d 139.  The first circuit distinguishes *Pinion*, 968 So.2d 131*,* on the basis that it involved the requirement of accepting an obnoxious juror to prove prejudice on appeal and made no mention of La.Code Crim.P. art. 800.

exhausted his peremptory challenges, and, therefore, need only show that the trial court abused its discretion by denying a challenge for cause.

*State v. Odenbaugh*, 10-268, pp. 23-25 (La. 12/6/11), 82 So.3d 215, 236-37, *cert. denied*, 568 U.S. 829, 133 S.Ct. 410, 184 L.Ed.2d 51 (2012) (citations omitted).

In this case, Defendant exercised a peremptory challenge to remove Ms. Matthews and further used all twelve of his allotted peremptory challenges provided for in La.Code Crim.P. art. 799. Thus, it must be determined whether the trial court abused its discretion in denying the challenge for cause. Louisiana Code of Criminal Procedure Article 797 provides the grounds for challenges for cause:

The state or the defendant may challenge a juror for cause on the ground that:

(1) The juror lacks a qualification required by law;

(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;

(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;

(4) The juror will not accept the law as given to him by the court; or

(5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.

In his brief, Defendant points to the following conversation in which Ms. Matthews's ability to be impartial was questioned, specifically a conversation involving Defendant's right to remain silent:

24

MR. MONROE [DEFENSE COUNSEL]:
. . . . In your experience teaching, when a child comes and makes a complaint, . . . oftentimes one of the first things you do is you go to the other person involved and you ask for their side of the side.

PROSPECTIVE JUROR SANDRA MATTHEWS:
    Well, I can answer that because I was a principal.

    . . . .

    You thoroughly investigate. You make no decisions about anything until you complete that investigation; and you're right. You do go to any other parties involved. You get their say. You interview anybody else that was in the vicinity and so forth.

MR. MONROE:
. . . . Are you going to be able to accept that a defendant does not have to put on any case? He doesn't have to give any details.

PROSPECTIVE JUROR SANDRA MATTHEWS:
    Well, when I said details, and you're right. In my profession you would look for the details. I guess more so meant that the information, I have to be open minded and listen to both sides in order to form a decision. So my answer to you would be I think I could do that.

MR. MONROE:
    OK. Do you feel like you need to hear from both sides?

PROSPECTIVE JUROR SANDRA MATTHEWS:
    Oh, definitely.

MR. MONROE:
    This is tricky for me, because I don't like that answer. It doesn't mean it's not a good answer, but Mr. Holmes talked about the presumption of innocence and the right to -- it was the slide that said Fifth Amendment. One of the things he had under there, it says you can't draw any determination, you can't presume anything, based on the lack of defendant's testimony. And that is the stated law. That's what the Judge is going to tell you as part of the law.

    Do you think you could set aside that part of you that you need to hear from sides? Are you going to be able to set that aside and judge the case on the merits even if you haven't heard a word from me?

PROSPECTIVE JUROR SANDRA MATTHEWS:
    I'm going to follow the law.

Defense counsel challenged Ms. Matthews for cause, because he did not think her desire to follow the law was enough to overcome her long-term experience as an

educator who wanted to hear from both sides. The State responded that Ms. Matthews emphatically stated she would follow the law. The trial court denied the challenge for cause after finding Ms. Matthews was sufficiently rehabilitated by defense counsel explaining the law.

As noted above, a trial court is vested with great discretion in ruling on a challenge for cause, and that ruling will not be disturbed unless a review of voir dire demonstrates the trial court abused its discretion. A review of voir dire indicates Ms. Matthews stated if the elements of the crime were not proven beyond a reasonable doubt, she would return a not guilty verdict. Ms. Matthews said she would be open-minded and listen to all the details presented before forming an opinion. Because she considered herself to be a rule follower, Ms. Matthews avowed to follow the law. Though she also indicated she would want to hear from both sides, Ms. Matthews concluded that she would follow the law after defense counsel reminded her of the presumption of innocence and the privilege against self-incrimination. As the supreme court observed in *State v. Dotson*, 16-473, p. 5 (La. 10/18/17), 234 So.3d 34, 39 (citation omitted):

> The trial judge's refusal to excuse a prospective juror on the ground he is not impartial is not an abuse of discretion where, after further inquiry or instruction (frequently called "rehabilitation"), the prospective juror has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence.

The trial court had the benefit of observing Ms. Matthews's demeanor and hearing her responses firsthand and was in a better position to determine whether she would be impartial in this case. *See State v. Dorsey,* 10-216, p. 28 (La. 9/7/11), 74 So.3d 603, 625, *cert. denied,* 566 U.S. 930, 132 S.Ct. 1859 (2012). After a review of voir dire, we find the trial court did not abuse its discretion in denying the challenge for cause, and this assignment of error has no merit.

Accordingly, we affirm Defendant's conviction for second degree murder.

26

**DECREE**

Defendant's conviction and sentence are affirmed. The trial court is directed to correctly inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of the opinion and filing written proof in the record that Defendant received the notice.

**CONVICTION AND SENTENCE AFFIRMED**.